**ENVIRONMENT NOW!, Tulare County Audubon Society, Plumas Forest Project, Forest Alert, Plaintiffs,**

v.

**Mike ESPY, Secretary of Agriculture, Jack Ward Thomas, Chief, United States Forest Service, Ronald E. Stewart, Regional Forester Region 5, Sandra Key, Forest Supervisor, Sequoia National Forest, Defendants.**

**No. CV–F–94–5474 OWW.**

United States District Court, E.D. California.

Aug. 23, 1994.

J. Kirk Boyd, David H. Williams, Boyd Huffman and Williams, San Francisco, CA.

Richard S. Luskin, Environment Now!, Malibu, CA.

Linda Anderson, U.S. Attorney's Office, Fresno, CA.

David H. Dun, Dun and Martinek, Eureka, CA.

Michael E. Haglund, Haglund and Kirtley, Portland, OR.

Jack Steven Worthley, Dinuba, CA.

Christopher Van Gundy, McCutchen Doyle Brown and Enersen, San Francisco, CA.

Marcia Abrams, U.S. Dept. of Agriculture, San Francisco, CA.

## MEMORANDUM OPINION AND ORDER RE:

**1) DEFENDANTS' MOTION TO STRIKE**
**2) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## 3) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WANGER, District Judge.

## I.

## INTRODUCTION

Plaintiffs Environment Now!, Tulare County Audubon Society, Plumas Forest Project and Forest Alert have filed this action against defendants Mike Espy, Secretary of Agriculture, Jack Ward Thomas, Chief, United States Forest Service, Ronald E. Stewart, Regional Forester Region 5, and Sandra Key, Forest Supervisor, Sequoia National Forest, (collectively, the "Federal Defendants") concerning the harvesting of trees in the Fish sale area of the Sequoia National Forest. The Federal Defendants have filed a motion for summary judgment, and a motion to strike two declarations submitted by plaintiff.

The parties have stipulated to the intervention of Sierra Pacific Industries, Michigan–California Lumber Company, and Sierra Forest Products as defendant-intervenors. Sierra Forest Products has filed a motion for summary judgment and opposition to plaintiffs' motion for injunctive relief.

## II.

## INTRODUCTION

On May 13, 1994, plaintiffs filed a complaint, challenging the Forest Service's sale of timber in six locations in the Tahoe, Plumas and Sequoia National Forests, based on the following claims for relief:

*First Claim for Relief:* Violation of the National Environmental Policy Act, ("NEPA"), 42 U.S.C. §§ 4321, *et seq.,* and the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.,* for failing to consider new scientific information related to six timber sales identified by plaintiffs;

*Second Claim for Relief:* Violation of the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.* ("NFMA"), for the failure to maintain or enhance wildlife diversity in the national forests, and failing to meaningfully monitor an indicator species, in connection with the timber sales;

*Third Cause of Action:* Breach of a settlement agreement, in which the Forest Service agreed to prepare an environmental document for the timber sales at issue.

On May 13, 1994, plaintiffs applied for a temporary restraining order, to prevent further harvesting in the Ruby sale area, to preserve the habitat of the California Spotted Owl. That motion was granted on that date. An additional hearing was held on May 17, 1994, after which the temporary restraining order was continued in effect until June 3, 1994. Plaintiffs were directed to file challenges to timber sales located in the Tahoe and Plumas National Forests in their proper venue, the northern division of this district. Jurisdiction was retained solely over the Fish timber sale.

The Fish timber sale project is located on the Kern Plateau in the Fish Creek Drainage area of the Sequoia National Forest,[1] between Troy Meadow and Pine Mountain, and encompasses approximately 7,643 acres of eastside pine, mixed conifer, red fir and lodgepole pine. AR 299. The Fish sale area is directly south of, and adjacent to, the Jack and Casa–Guard sales areas. Both the Jack and Casa–Guard sales are the subject of pending litigation in which a preliminary injunction was granted, requiring defendants to prepare an EIS before further harvesting could be completed, *Tulare County Audubon Society v. Espy,* CV–F–93–5373 OWW (August 10, 1993).

The California Spotted Owl is not designated as a threatened or endangered species, but is classified as "sensitive" by the Forest Service.[2] The Forest Service has selected

---

1. The Sequoia National Forest is an administrative unit of the Pacific Southwest Region, or Region 5, which in turn is an administrative unit of the National Forest System. The administrative head of each national forest is a Forest Supervisor; the administrative head of each region is a Regional Forester. The Forest Service itself is an administrative unit of the Department of Agriculture.

2. "Sensitive" species are those species of plants or animals which:

 1) have appeared in the Federal Register as proposals for classification and are under con-

the spotted owl as an "indicator species" [3] for the Sequoia National Forest. *Tulare County Audubon Society v. Espy,* CV–F–93–5373 OWW, at 13 (August 10, 1993).

The Fish sale was originally proposed in a letter of intent in 1985, and analyzed by the Forest Service in 1989, in an environmental assessment ("EA") performed in December of that year. AR 238. The Fish Sale was approved on January 4, 1990, when a Decision Notice and Finding of No Significant Impact ("DN/FONSI") was signed by the Forest Supervisor. The Fish DN/FONSI was administratively appealed in February, 1990. The Regional Forester affirmed. Tulare County Audubon Society challenged the DN/FONSI in a district court action, *Tulare County Audubon Society v. United States,* CV–F–90–564 EDP (E.D.Cal.). On February 13, 1991, that action was dismissed pursuant to a settlement and written stipulation of the parties (the "settlement agreement"). In July, 1992, a scientific report was issued and adopted by the Forest Service, titled *The California Spotted Owl: A Technical Assessment of Its Current Status* ("CASPO"). This report was prepared by an Interagency California Spotted Owl Steering Committee, which was formed in June of 1991 in response to concerns over the continued use of the Spotted Owl Habitat Areas ("SOHA") strategy for management of the spotted owl. The steering committee included members from the State of California and U.S. Government, observers from State and local agencies, and private interest groups, including timber industry and environmental group representatives. The steering committee formed a scientific advisory team (the "Technical Assessment Team"), which included Forest Service scientists.

Prior to CASPO, the Forest Service had developed a cumulative effects analysis ("CEA") process, to ensure that management options for the California spotted owl would be maintained until the Technical Assessment Team completed its report. After CASPO was issued, the Forest Service performed an EA of the CASPO report and issued a Decision Notice on January 13, 1993, adopting interim guidelines to implement CASPO recommendations for timber management activities to protect the California spotted owl. *California Spotted Owl Sierran Province Interim Guidelines Environmental Assessment,* January 1993 ("interim guidelines"). This Decision Notice also amends the guidelines for owl habitat management in ten affected forest plans,[4] including the Sequoia National Forest Plan. The declared purpose of the Forest Service's interim guidelines is to respond to the concerns identified in the CASPO report, specifically: 1) the need for a management strategy for the spotted owl that assures that viability of the owl will be maintained, and replaces the SOHA strategy which "would likely lead to extinction of the species;" 2) recognition that "timber harvest practices have led to a serious decline in the number of large, old trees which are preferred by the owl;" and 3) consideration of the threat of stand-destroying fires in any strategy. CASPO EA at DN–2, DN–3.

The principal recommendations of the CASPO report implemented through the interim guidelines are: 1) identify owl "activity centers" and delineate an area of 300 acres around this activity center in which no logging or other stand-altering activity is to occur other than light underburning (called protected activity centers or PACs); 2) with-

---

sideration for official listing as endangered or threatened species;

2) are on an official State list; or

3) are recognized by the Regional Forester as needing special management in order to prevent the need for their placement on Federal or State lists.

The Spotted Owl is a California state species of concern.

**3.** To measure the Forest's accomplishment of wildlife goals, management indicator species are designated to act as barometers for wildlife communities.

**4.** Forest plans are established by the Secretary under National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1604, *et seq.,* and describe, for a ten to fifteen year period, those activities that are permissible and how they may be carried out. 16 U.S.C. § 1604(i). The forest plan governing Sequoia was approved on February 25, 1988, and became effective April 4, 1988. Forest plans are accompanied by a Final Environmental Impact Statement, ("FEIS") developed by the Sequoia National Forest Supervisor to comply with the requirements of NEPA.

in strata preferentially selected for nesting by owls (selected strata) which are outside of PACs, one commercial entry is allowed during the interim period, no removal of live trees 30 inches in diameter breast height (dbh) or larger is allowed, and retention of 40 percent or greater of the basal area and canopy closure in the largest trees available; 3) within strata utilized, but not preferred for nesting by owls (other strata), one commercial entry is allowed during the interim period, no removal of live trees 30 inches dbh or larger is allowed, and retention of 30 percent of the basal area in the largest trees available; and 4) fuel loading. CASPO EA at DN–4, DN–5; CASPO at 20–21.

On February 4, 1993, the Federal Defendants issued an environmental assessment for the Fish sale ("Fish EA"), tiered to the Forest Plan and the parties' settlement agreement in *Tulare County Audubon Society v. United States,* CV–F–90–564 EDP (E.D.Cal.). On February 24, 1993, the Forest Supervisor issued a decision to adopt Alternative 4 of the Fish EA ("Fish DN"). Alternative 4 eliminates the use of clearcutting and regeneration mosaic, relying on shelterwood harvesting in selected stands. Under this alternative, approximately 4.97 million board feet were targeted for harvest, and five miles of road for reconstruction. Alternative 7, which was based on CASPO guidelines, and Alternative 1, the no-action alternative, were both considered and rejected.

Plaintiff Tulare County Audubon Society administratively appealed the Fish DN. On November 22, 1993, the regional forester affirmed the decision of the forest supervisor. Further review was declined by the Forest Service on December 21, 1993.

Plaintiffs seek a preliminary injunction that prohibits:

> .... defendants from felling, cutting, thinning or topping in any manner, timber 30″ dbh located in the Fish Sale areas pending the decision on plaintiff's request for a permanent injunction.

The Federal Defendants and defendant-in-intervention Sierra Forest Products filed a motion for summary judgment, seeking dismissal of plaintiffs' complaint on various grounds.

## III.

## FEDERAL DEFENDANTS' MOTION TO STRIKE

The Federal Defendants move to strike the declaration of Mr. Charles L. Sisco, as improperly outside the administrative record. Mr. Sisco's declarations are submitted to both refute and explain the findings in the environmental documents prepared by the Forest Service. The Federal Defendants argue that plaintiff was encouraged to make critical comments during the administrative process, and the assertion of any new comments in the present proceedings is inappropriate. The Federal Defendants filed a similar motion in *Tulare County Audubon Society v. Espy,* CV–F–93–5373 OWW, which was denied.

■ The parties agree that resolution of the cases will involve review of the Forest Service's administrative record to determine whether its actions were "arbitrary, capricious or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). In applying the arbitrary and capricious standard, "[t]he court shall review the whole record or those parts of it cited by a party ..." 5 U.S.C. § 706. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see also, Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992). Because review is narrow, the court normally should not accept new evidence, but limit its examination to the administrative record. *See, e.g., Friends of Payette v. Horseshoe Bend Hydroelectric,* 988 F.2d 989, 997 (9th Cir. 1993). Exceptions to the general rule exist when: (1) the agency has relied on documents not in the record, *Friends of Payette,* 988 F.2d at 997; (2) a plaintiff alleges in a challenge to an EIS that an agency failed to consider a serious environmental consequence, *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1437 (9th Cir.1988), *corrected,*

867 F.2d 1244 (9th Cir.1989); or (3) a plaintiff has made a "strong showing" of agency bad faith. *Id.*

Affidavits from experts can be used to explain agency action. In *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1520 n. 22 (9th Cir.1992), the Ninth Circuit determined that, in a challenge to a Forest Service plan, it was proper to rely on analysis of a Forest Service computer program performed by an expert witness, although the analysis was outside the administrative record:

> "A court may consider evidence outside the administrative record as necessary to explain agency action.... The purpose of the court's enquiry should be to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision." *Id.* at 829. The issues presented by this case are sufficiently complex with the affidavit, let alone without it, to justify using it as needed.

*Mumma,* 956 F.2d at 1520 n. 22; *see also, Citizens For Environmental Quality v. United States,* 731 F.Supp. 970, 983 (D.Colo. 1989). "The district court may also look outside the record ... when supplementing the record is necessary to explain technical terms or complex subject matter." *Friends of Payette,* 988 F.2d at 997. Here, the object of scrutiny has been the subject of on-going scientific study by teams of researchers, analyzing technical and complex environmental and biological information. Mr. Sisco's declaration will be helpful in highlighting perceived deficiencies in the environmental review process, and explaining technical terms and complex subject matter, it will not be stricken on the grounds that it is outside the agency record.

At oral argument, the Federal Defendants challenged Mr. Sisco's qualifications as an expert, arguing that his declaration contained various errors refuted by the Federal Defendants' own witnesses. However, Mr. Sisco's declaration contains uncontested statements establishing his qualifications as an expert, including: 1) a Master of Science degree in wildlife biology, a Bachelor of Science degree in zoology, an Associates degree

in Resources Management, and a Bachelor of Science degree in forestry; 2) a position as a regional biologist and forester for the National Audubon Society, a forester and wildlife biologist for the Forest Service, and a research biologist for Humbolt University; 3) work as a spotted owl research biologist under contract to Forest Service Region 5, and wildlife biologist with the Six Rivers National Forest. Although his opinions are subject to dispute, Mr. Sisco is qualified to offer opinions on spotted owl activity, and suitability of habitat, at the Fish sale area. The Federal Defendants' motion to strike Mr. Sisco's declaration is DENIED.

The Federal Defendants also move to strike the declaration of Ms. Carla Cloer, who provides information regarding interpretation of the parties settlement agreement in *Tulare County Audubon Society v. United States,* CV–F–90–564 EDP (E.D.Cal.). The Federal Defendants argue that the settlement agreement contains an integration clause, limiting judicial review to the four corners of the settlement document.

Plaintiff asserts that California provides the rule of decision in interpreting the settlement agreement, although generally federal law controls the interpretation of a contract where the United States is a party. *United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989). Under either standard, parol evidence is inadmissible to contradict a clear and unambiguous provision of a contract, where the parties intended that the written contract be the complete and final expression of their agreement. *Compare, U.S. v. Triple A Machine Shop, Inc.,* 857 F.2d 579, 585 (9th Cir.1988) (federal law); *with, Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). Parol evidence is admissible to explain ambiguous terms in an integrated agreement. *Greco v. Department of the Army,* 852 F.2d 558, 560 (Fed.Cir.1988).

The settlement agreement in *Tulare County Audubon Society v. United States,* CV–F–

90–564–EDP (E.D.Cal.), states that defendants agreed:

> ... that prior to the decision to re-offer the Fish Timber Sale, the Forest Service will prepare an environmental document (a new environmental assessment or an environmental impact statement, as appropriate) for the Fish Timber Sale area which will include analysis of the surrounding relevant areas of the Sequoia National Forest.

Defendants also agreed that:

> The environmental document prepared for the Fish Timber Sale will comply with the National Environmental Policy Act and will, at a minimum, contain a discussion of all issues set forth in Sections P.3.a. through P.3.p. and Sections Q.3.h. of the Sequoia National Forest Mediated Land Management Plan 1990 Settlement Agreement.

Plaintiff submits the declaration of Carla Cloer, who was actively involved in settlement discussions, and recalls discussions with members of Tulare County Audubon regarding the meaning of the agreement. Cloer Declaration, at ¶ 8. Ms. Cloer states:

> Fundamental to the agreement was the concern that the Kern Plateau had been subject to many separate impacts in the form of fires and numerous timber sales and that each of these had been previously viewed and addressed by the Forest Service in isolation without considering the cumulative impacts of the many other events. Accordingly, it was my understanding that of the terms and spirit of the agreement, that if either the Casa–Guard or Fish Timber sales were re-offered for sale, it would only be after an environmental analysis that considered the impacts on the entire Kern Plateau in light of the historical level of logging and fires.... Anything short of a consideration of the Casa–Guard/Jack/Fish timber sale areas as one collective project would squarely violate what I understood to be the spirit of the settlement agreement.

Cloer Declaration, at ¶¶ 9, 13. Ms. Cloer also believed the Forest Service "agreed as part of the agreement, that it would prepare an EIS" if the Fish sale went forward. Cloer Declaration, at ¶ 11.

The Federal Defendants argue the settlement agreement left the type of environmental document to be prepared to the Forest Service's discretion, and move to strike Ms. Cloer's declaration as an inadmissible attempt to assert a collateral agreement to prepare an EIS, in any event, or to prepare a single EIS which would assess the cumulative impacts of all three Kern Plateau sales.

■ The plain language of the settlement agreement requires that "[t]he environmental document prepared for the Fish Timber Sale will comply with the National Environmental Policy Act." NEPA permits federal agencies to determine whether an EIS is necessary for non-categorical activity, by first preparing an environmental assessment. 40 C.F.R. §§ 1501.3; 1501.4(a)(1)(b). Although the "as appropriate" language does not mean that the Federal Defendants have unlimited discretion to determine whether an EIS is appropriate, the signatories intended that decision to be guided by NEPA standards. *See, Tulare County Audubon Society v. Espy*, CV–F–93–5373 OWW, at 37–40 (analyzing Casa–Guard provisions of same settlement agreement under NEPA). The contract unambiguously permits either "a new environmental assessment *or* an environmental impact statement" to be prepared (emphasis added). The language is not susceptible to another interpretation. The declaration of Ms. Cloer is not admissible to show that the settlement agreement requires an EIS, either with respect to the Casa–Guard sale, or all three timber sales, because the agreement unambiguously states that either an environmental assessment or an EIS is appropriate, so long as NEPA is not violated.

The Federal Defendants' motion to strike the declaration of Ms. Cloer is GRANTED, in part. That declaration cannot be imposed as an absolute obligation on the Federal Defendants to prepare an EIS, without any consideration that the Fish EA may have satisfied NEPA requirements. That interpretation is contrary to unambiguous provisions in the settlement agreement.

## IV.

## JURISDICTION

**Failure to Exhaust**

Defendants seek dismissal of plaintiffs Environment Now, Plumas Forest Project, and Forest Alert, for failure to exhaust administrative remedies prior to this challenge to the Fish EA. *See, Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842, 847 (9th Cir.1987) (plaintiff could not challenge EA which had not been administratively appealed). Of the named plaintiffs in this action, only Tulare County Audubon Society was involved in the administrative appeals.

Plaintiff acknowledges that, after the northern forest sales have been severed from the case, only Tulare County Audubon Society, which administratively appealed the Fish DN/FONSI, is a proper plaintiff. Plaintiffs' Opposition, at p. 1 n. 1. Because of this concession, the NEPA claims of plaintiffs Environment Now!, Plumas Forest Project and Forest Alert, having been voluntarily withdrawn, are DISMISSED.

**Waiver**

■ Defendant challenges plaintiff Tulare County Audubon Society's ability to raise the following arguments, on the ground that plaintiff failed to raise those arguments before the administrative agency:

1) An EIS is necessary to consider the effects on the spotted owl;

2) Insufficient data existed to meaningfully monitor the spotted owl; and

3) The failure to prepare an EIS is a breach of the Settlement Agreement filed in *Tulare County Audubon Society v. United States,* CV–F–90–564–EDP (E.D.Cal.).

As a general rule, if an argument is not raised before an administrative agency at an appropriate time, it cannot be raised on a later challenge to the agency's final decision unless exceptional circumstances exist or the agency was without jurisdiction to consider the argument. *Abel v. Director, Office of Workers Compensation Programs,* 932 F.2d 819, 820–21 (9th Cir.1991); *Reid v. Engen,* 765 F.2d 1457, 1460 (9th Cir.1985). As stated in *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952):

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

Tulare County's Notice of Appeal of the Fish EA, filed April 13, 1993, indicates that the agency had the opportunity to address the arguments identified by defendant.

■ Regarding the first argument identified by defendants—that an EIS was required to monitor spotted owls—as to the Notice of Appeal as a whole, Tulare County argued that the EA was insufficient, in part on the grounds that the EA's failed to "fully implement the letter and the spirit of the CASPO findings," which was intended to ensure continued owl habitat. AR 114, 119. The Notice of Appeal expressed concern the Fish sale had been "rushed out" to avoid the necessity of implementing the Interim Guidelines, which also sought to preserve owl habitat. AR 114. The Notice of Appeal attacked the finding of no significant impact on owls. AR 114. The Notice of Appeal concludes:

> To pursue this project further without additional study, adjusted findings, *circulation of a full scale EIS* for management of this unique area of the Kern Plateau and issuance of a New Decision would be arbitrary and capricious as well as poor stewardship.

AR–126 (emphasis added). By asking that an EIS be prepared, and arguing that the Fish EA failed to follow CASPO and Interim Guidelines, the Notice of Appeal sufficiently identified the argument that an EIS was required to assess the Fish sale's effects on the spotted owl.

■ Regarding the second argument identified by defendant—that insufficient data existed to meaningfully monitor the spotted owl—the Notice of Appeal states:

> There is no information as to whether the owl population is increasing or decreasing or what the disruption of nesting season

and depletion of snags [5] and overstory removal will do to this trend. There is no consideration that the pairs found to be non-breeding when last surveyed might be nesting during the operating seasons. AR–115. This argument sufficiently raises Tulare County's concern that the agency had insufficient information to monitor the spotted owl.

■■■■■■ Regarding the breach of contract claim, defendants cite 36 C.F.R. § 217.18, which states:

> Policy in event of judicial proceedings It is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the procedures available under this part.

Defendants argue that plaintiff has waived the right to argue the breach of contract claim in a judicial forum, because plaintiff failed to raise it on the challenge to the Fish EA before the agency. But plaintiff's breach of contract claim is not "subject to review under this part," because a breach of contract claim, which does not impose an exhaustion requirement by its terms, is not traditionally subject to administrative review. *Cf.* 36 C.F.R. § 217.4(10) (decision "where relief sought is reformation of a contract or monetary damages" is expressly exempt from administrative review). In addition, 36 C.F.R. § 217.18 is a policy statement, defined as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1012–13 (9th Cir. 1987), *quoting, Attorney General's Manual on the Administrative Procedure Act.* Such statements also "serve to 'educate' and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases." *Mada–Luna*, 813 F.2d at 1013. Because general statements of policy are not the product of either notice and comment rulemaking or adjudication, they lack the force of law. *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33 (D.C.Cir.1974). As a regulation intended to serve an only an advisory function, 36 C.F.R. § 217.18 does not require exhaustion of plaintiff's breach of contract claim.

The Federal Defendants' arguments that plaintiff has waived issues for failure to raise them in the administrative process are rejected.

**Plaintiff's Standing Under Article III**

■■■■ The Federal Defendants argue that the allegations in the complaint are insufficient to establish Article III standing, because the complaint merely states plaintiffs use land in the vicinity of the Fish sale. As the Supreme Court found in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 886, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990), statements that plaintiff "uses unspecified portions of an immense tract of territory," are insufficient to show a concrete injury necessary to establish standing to bring a NEPA claim. *See also, People for Ethical Treatment of Animals v. HHS*, 917 F.2d 15, 17 (9th Cir.1990) (plaintiff's use of unspecified portions of a large city, some portions on which hazardous substances might be transported or disposed, is insufficient to establish standing).

Tulare County Audubon must allege "a sufficient geographical nexus to the site of the challenged project that it may be expected to suffer whatever environmental consequences this project may have." *Mumma*, 956 F.2d at 1527. The complaint states, at ¶ 20:

> The Tulare County Audubon Society is a private, nonprofit California corporation dedicated to the preservation of natural ecosystems. The Organization's members have a specific interest in the survival of the California Spotted Owl. The organization has members that use the Sequoia National Forests and other National Forests as well. This use includes observing and appreciating spotted owls and other wildlife and enjoying the old growth forests which the owls and other wildlife spe-

---

**5.** "Snags" are stumps or other standing dead trees, which can house prey of the spotted owl, such as the flying squirrel, or spotted owl nests. Sisco Declaration, at ¶ 22.

cies inhabit. This use is threatened by the timber sales at issue[.]

Plaintiff has also submitted declarations establishing that members of the Tulare County Audubon Society "hike, live and study in the Sequoia National Forest, and are specifically interested in the survival of the California spotted owl." Declaration of Daniel Utt, at ¶ 1 (June 20, 1994). For example, Mr. Utt states he has lived in the Sequoia National Forest for forty-four years, and currently lives about sixty miles away from the Fish sale site. *Id.*, at ¶ 2; *see also*, Cloer Declaration, at ¶¶ 2–4 (member frequents Sequoia, and is particularly interested in bird species and their habitat, such as the California spotted owl). In *Seattle Audubon Society v. Espy*, 998 F.2d 699, 703 (9th Cir.1993), the Ninth Circuit found that an organization had standing to challenge the Forest Service's adoption of an owl management plan, where declarations described their geographic proximity to the affected area, the members frequent visits there, and the aesthetic and scientific interest in the owl. The allegations submitted by plaintiff are analogous.

Defendants' motion to dismiss plaintiff's complaint for lack of standing is DENIED.

## V.

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Legal Standard for Preliminary Injunctive Relief

A court may issue a preliminary injunction if the movant meets one of two tests: First, if:

(1) Strong likelihood of success on the merits;

(2) Balance of irreparable harm favors the movants; and

---

**6.** 40 C.F.R. § 1508.27 defines a finding that an agency action "significantly" affects the environment requires consideration of: 1) the short- and long-term *context* of the proposed action, which requires consideration of both the human and national societal context, as well as that of the affected region; and 2) the *intensity*, or *severity*, of the proposed action, which must consider,

(3) The public interest favors granting the injunction.

*Landi v. Phelps*, 740 F.2d 710, 712 (9th Cir. 1984), citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 87 (9th Cir.1975); or second, by demonstrating:

... either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tip sharply in his favor.

*Id.* Under the second formulation, the Supreme Court requires that the public interest be considered where the public may be affected. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983). The Ninth Circuit has stated that the tests are not separate, but "represent[ ] two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985).

### NEPA Claim

#### Likelihood of Success on the Merits

NEPA requires that federal agencies prepare a detailed statement on the environmental impact of any proposed major federal action which significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C)(i). The Code of Federal Regulations provides that a "major federal action:"

... includes actions *with effects that may be major* and which are potentially subject to federal control. Major reinforces, but does not have a meaning independent of significantly.[6]

40 C.F.R. 1508.18 (1991).

For injunctive relief to issue, plaintiffs must show likelihood of success on the

---

*inter alia*, the degree to which the proposed action will affect the public health and safety, the unique characteristics of the geographic area, the quality of the human environment, the cumulative impact of related actions, the degree to which an endangered or threatened species may be affected, and the possibility that the proposed action involves unique or unknown risks.

merits that the failure to prepare an EIS was arbitrary and capricious. *See, Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374–76, 109 S.Ct. 1851, 1859–61, 104 L.Ed.2d 377 (1989); *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1330 (9th Cir.1993). An agency proposing major federal action must assess the significance of environmental effects on the local area by considering cumulative impacts[7] of a proposed site-specific action, together with past and reasonably foreseeable related actions. 40 C.F.R. 1508.27(a) and (b)(7); *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 980 (9th Cir.1993). An agency's decision not to prepare an EIS when faced with new scientific information is a classic example of a factual dispute the resolution of which implicates substantial agency expertise. *Marsh,* 490 U.S. at 376, 109 S.Ct. at 1860.

> This standard requires [a court] to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed actions, carefully reviewing the record to ascertain whether the agency's discretion is founded on a reasoned evaluation of the relevant factors. *Marsh,* 490 U.S. at 373–74 [109 S.Ct. at 1859.] This inquiry into the facts is to be searching and careful. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 [91 S.Ct. 814, 823, 28 L.Ed.2d 136] (1971).

*Greenpeace Action,* 14 F.3d at 1332. The Ninth Circuit has recently reiterated the necessity for deferential review where the decision not to prepare an EIS rests on scientific data:

> [W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861. Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to that in-

formed discretion. *Id.* at 377, 109 S.Ct. at 1861.

*Greenpeace Action,* 14 F.3d at 1332. NEPA does not require courts to resolve disagreements among various scientists as to methodology. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). Where the agency has already prepared an EA and has concluded that no EIS is necessary, that decision may be deemed arbitrary and capricious only where the government fails to address crucial factors, consideration of which is essential to a truly informed decision. *Greenpeace Action,* 14 F.3d at 1333, *citing, Foundation for North American Wild Sheep v. United States,* 681 F.2d 1172 (9th Cir.1982).

Plaintiff argues the CASPO report represents significant new information that requires incorporation into an EIS before the Fish sale is completed. Plaintiff relies heavily on the fact that preliminary injunctive relief was granted for the Casa–Guard and Jack sales, in *Tulare County Audubon Society v. Espy,* CV–F–93–5373 OWW, and that the standard for relief is not demanding, as articulated in *Natural Resources Defense Council v. Duvall,* 777 F.Supp. 1533, 1538 (E.D.Cal.1991):

> [O]nly in those obvious circumstances where no effect on the environment is possible, will an EA be sufficient for the environmental review required under NEPA. Under such circumstances, the conclusion reached must be close to self-evident....

The Federal Defendants argue that, unlike the Casa–Guard, Jack and Cottonwood sales, the Fish environmental documents were prepared after the CASPO report was issued, and the Fish EA fully addresses CASPO's concerns. Alternative 7 is based on CASPO guidelines, and "would implement most of the management recommendations for public timberlands in the Sierra Nevada," as described in CASPO. Alternative 1, the no-action alternative, would have resulted in no harvesting, but continuation of current management practices. AR 247. The DN/FON-

---

7. 40 C.F.R. § 1508.7 defines "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other action. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

SI chose Alternative 4 instead, based on the finding that:

[t]he California spotted owl will not be affected because surveys conducted have not found any to exist within the areas proposed for activities and a cumulative effects analysis concludes that no significant effects will result.

AR 234. The Fish DN/FONSI relied on the Fish EA, which evaluated the potential environmental effects of all proposed alternatives, including air quality, culture, engineering, fisheries, fuels/fire management, recreation, socioeconomic effects, visual resources, wildlife, and concerns related to threatened, endangered and sensitive species. Cumulative effects of timber management activities upon such resources as watershed, spotted owls, wildlife habitat, recreation, and visual resources were also analyzed. AR 228. Unlike pre–CASPO practice, Alternative 4 uses neither clearcutting nor regeneration mosaic harvesting, but relies on shelterwood or overstory removal harvesting, and group selection harvesting on other acreage. AR 253. The DN/FONSI justified Alternative 4 by noting that it:

... emphasizes visual resources, the harvest of timber from suitable lands, and the regeneration of stands to contribute to Forest Plan goals, while eliminating the use of clearcutting and regeneration mosaics;

AR 230. The DN/FONSI also noted that Alternative 4 was desirable because: 1) All harvest units were designed to meet partial retention along roads and trails of concern; 2) The impact on watersheds is well below the threshold of concern; and 3) It required no new road construction. AR 230. On this basis, the DN/FONSI concluded that Alternative 4 was not a major federal action having a significant impact on the human environment, and that no cumulative effects were expected when specified mitigation measures were applied. AR 234.

During the EA process, the Forest Service published notice and updates, consulted and solicited comments from numerous environmental organizations and agencies, and various members of the public. AR 240, 337–39. From these comments, an ID team identified issues to be addressed in the EA. AR 244–45. Among these issues were the potential effects on the California spotted owl and its habitat, for which a "Biological Evaluation and Cumulative Effects Analysis," ("Fish BE/CEA") was prepared in January, 1993. AR 386 (Appendix E to Fish EA). The purpose of the Fish BE/CEA was "to review the effects of the Fish Timber Sale to determine if proposed activities may affect the California spotted owl," and to serve as a Cumulative Effects Analysis (CEA) and BE/CEA for the Fish EA. AR 387. The CEA did not require modification of any of the developed alternatives to avoid foregoing future options for the management of spotted owl habitat. AR 230. The DN/FONSI states, "[b]ased on the small amount of suitable habitat that currently exists, the small amount that would be potentially harvested, and the lack of California spotted owl presence within the Fish analysis area, it was determined that [Alternative 4] would not adversely affect the spotted owl." AR 230.

The Fish BE/CEA analyzed the Fish sale project area and the surrounding 1.3 mile area, which encompasses some of the Jack sale area. AR 387. The Fish BE/CEA acknowledges the past cumulative effects of commercial harvesting, and fire or insect damage, and discussed the potential reasonably foreseeable effects of all proposed alternatives. AR 403–05. The Fish BE/CEA noted that six visits had been made to the site and surrounding area between 1990 and 1991, and three visits in 1992, and that no spotted owls had been detected during any visit, stating:

Of the 19,600 acres in the Fish analysis area, only 691 is suitable for spotted owl nesting and foraging. Studies by Verner (1989) indicate that 2500 acres of suitable habitat occur within home ranges of spotted owl pairs in the Sierra National Forest, north of the analysis area. The amount of suitable habitat found in the Fish analysis area is well below what is needed to support a pair of owls.

AR 390–91. The Fish BE/CEA found no owl use areas in the Fish area, and noted that the presence of potential predators and competitors for food, such as the great horned

owl and northern goshawk, may be a factor in the lack of spotted owl sightings. AR 391–92. The Fish BE/CEA states:

All action alternatives will increase the level of disturbance in the area during project implementation and site preparation activities. The presence of logging equipment and increased traffic in the area will increase noise and ground disturbance for the short term. Over the long term, the removal of large trees will reduce the potential for the possibility of owl use occurring in the area in the future. *Although the existing suitable habitat is highly fragmented and only found in small quantities, the removal of additional habitat, under Alternatives 4, 5, and 6, may decrease the potential for the area to become suitable for spotted owl use.*

AR 403 (emphasis added). Despite this finding, the Fish BE/CEA stated that the removal of 12% (83 acres) of existing suitable habitat proposed by Alternative 4 "may affect, but is not likely to adversely affect" the spotted owl. AR 404–05. The Fish BE/CEA explains:

As a result of past timber harvest in the Fish project area, the amount of suitable spotted owl habitat has declined significantly. Review of photos taken in 1940 (pre-timber harvest) indicate that the Fish analysis area once contained approximately 1,900 acres of suitable habitat, compared to 691 acres which are currently suitable.... It is possible that at one time the area could have been capable of supporting foraging habitat and potential nesting habitat for up to one pair of spotted owls. However, this possibility is low as it is not probable that the area ever contained large continuous blocks of suitable habitat, which are preferred by the owl.

AR 404.

Plaintiff submits the declaration of Charles L. Sisco, which states that Mr. Sisco has reviewed owl survey information provided by the California Fish and Game Report, and has made a field examination of the sale areas on June 5, 1994. According to Mr. Sisco, spotted owls were found in the Fish and Jack timber sales areas as recently as 1989. Sisco Supplemental Declaration, at

¶ 3. Mr. Sisco argues that the Forest Service conclusions are erroneous:

[An] examination [of the Fish sale area] from the air dramatically demonstrates that the same fragmented old growth habitat characteristics exist across the Kern Plateau and particularly in the Fish Creek Watershed. On the ground examinations of the area reveals that the individual sale units in the Fish sale include many very large old trees. These are precisely the type of trees which I understand the CASPO report to be describing when it states as one of the "three primary objectives" of any interim strategy must be to "protect very large, old trees throughout the Sierran conifer forest." Also, this is a classic example of where the CEA and CASPO approaches suggest opposite results.

Sisco Declaration, ¶ 4 (June 17, 1994). Mr. Sisco states the Fish environmental documents focus narrowly on owl sighting during the past three to four years, ignoring significant changes in the Kern Plateau since 1961:

[Since] 1961, a significant amount of the Kern Plateau was habitat of greater than 50% canopy closure in very large old trees. The Forest Service BE acknowledges that it was at least 1,900 acres. Also acknowledged by the Forest Service, two thirds of this habitat has been eliminated over the past 30 years by the many logging entries into the area.

Although I have not examined any survey records and do not know if any survey records exist back to the early 1970's, the decline in the apparent population of owls since 1986 supports the reasonable conclusion that prior to the current period of heavy, "top-down" harvesting, there was a substantial population of owls.

Indeed, it is telling that according to Forest Service survey records, the last sighting of an owl in the Fish sale area was in 1986, one year before the Dark and Bald timber sales in the area both of which involved extensive clear-cutting.

Sisco Declaration, at ¶¶ 43–45. Mr. Sisco states that Forest Service records indicate a SOHA was planned for the southern portion of the Fish sale area, evidencing agency acknowledgement of owl activity in the area.

*See,* Plaintiff's Exhibit K. CASPO recognizes that monitoring must be conducted over a long-range period. CASPO, at 28. Mr. Sisco faults the Forest Service's methods of surveying owls:

> Review of the survey information and state Department of Fish and Game database demonstrate a significantly higher presence of owls than suggested by the Fish EA.... It also reveals that the Forest [Service] failed to follow survey protocol and that these very failures undermine any reliance placed on survey results.

Sisco Declaration, ¶¶ 4, 5 (June 17, 1994). The Fish BE/CEA states the owl surveys were conducted in 1990 between August 7th and August 21st. AR 389. Mr. Sisco states August is too late to determine whether breeding spotted owls are present, and that the 1990 survey was inadequate for failing to survey left out large portions of the planning area, "especially near areas where spotted owls had been found in previous years." Sisco Declaration, at ¶ 48. Mr. Sisco states that later surveys are similarly inadequate:

> The 1991 survey also failed to follow the Regional guidelines for 6 complete visits. The Forest Service in the BE suggested that since they had surveyed 3 time[s] in 1990, only 3 visits were necessary for 1991. This is contrary to protocol. In addition, it appears that only 1 or 2 survey routes were conducted during the breeding season. Regional protocol requires at a minimum 4 complete surveys be completed prior to June 15.... It is difficult to believe that had surveys been completed as documented in the owl survey bindings, no spotted owls would have been observed. It is imperative that a minimum of 6 surveys be completed in a year to insure adequate coverage of the habitat.

Sisco Declaration, at ¶ 49.

The Fish BE/CEA states that, in 1991, the owl surveys began late because heavy snowfalls prevented access for trips earlier in the year. Mr. Sisco asserts that a work station one-half mile from the Fish sale was open on May 20, 1991, which belies the Fish BE/CEA's assertion that surveying was not possible during that time. Sisco Declaration, at ¶ 51. Mr. Sisco states the surveys were inadequate for failing to survey the entire Fish region, and survey of areas deemed suitable habitat is insufficient. Id. at ¶ 53.

Plaintiff argues the Fish environmental documents fail to consider that, even if the Fish sale area is not presently suitable habitat, it exhibits potential to become a habitat in the future. As stated in CASPO, in rejecting the CEA process:

> [T]he CEA process has no provision to retain important habitat attributes *in areas not now classified as suitable nesting or foraging habitat, even though these may have the potential to become suitable at varying times in the future*—some sooner and some later.

CASPO, at 16 (emphasis added). CASPO acknowledges it is difficult to determine areas of suitable habitat. CASPO, at 28. Plaintiff argues the Forest Service's environmental documents do not meaningfully consider CASPO's recommendation to retain old growth forest as potential future habitat for an entire five-year study period. *See generally,* CASPO, at 20.

Mr. Sisco asserts that the Fish sale area, like the Casa–Guard and Jack sale areas, exhibits characteristics of an "area of concern" as that term is used in the CASPO report. According to CASPO, an area of concern has the following five characteristics: 1) bottlenecks in the distribution of habitat or owl populations; 2) gaps in the known distribution of owls; 3) locally isolated populations; 4) highly fragmented habitat; and 5) areas of low crude density of spotted owls. CASPO, at 45. Mr. Sisco states the Kern Plateau lies next to Gap B, identified in CASPO as a bottleneck in distribution in the Northern Sierran Province, and is severely fragmented, due to logging and fire damage, and in an isolated area of crude density. ¶ 31. Area 8, argued to be near the Fish sale, is "characterized, in part, by small isolated populations that are more vulnerable to extinction by local stochastic or catastrophic events." CASPO, at 45.

Mr. Sisco points out that owls use extremely large areas of suitable forested habi-

tat, often old growth,[8] generally a few thousand acres. Sisco Declaration, at ¶ 20; CASPO, at 162, Table f. Requiring spotted owls to use fragmented forest to find sufficient prey increases the risk of predation by great horned owls. Id. at ¶ 22. Plaintiff argues the Fish sale may impact the Area 8 population, and that the Fish environmental documents ignore CASPO's warning that it is difficult to characterize the precise nature of a spotted owl's preferred habitat. CASPO, at 28. Plaintiff argues defendants acted arbitrarily and capriciously by relying on short-sighted and incomplete surveys to determine that no EIS need be prepared, and precluded public participation from the process.

The Federal Defendants argue the present motion is distinguishable from the preliminary injunction issued in *Tulare County Audubon Society v. Espy*, CV-F-93-5373 OWW, because when that injunction was argued, the court had not been apprised that the Kern Plateau lacked potential to become suitable habitat, and that spotted owls could not sustain a population there, whether or not large trees are retained. On June 8, 1994, the Forest Service prepared a revised environmental assessment ("Revision 1"), after three members of the CASPO technical assessment team[9] reviewed the Casa-Guard and Jack sale areas, to determine the effects of those sales on the spotted owl and in response to this court's August 10, 1993 order. Based on the review team's findings of the adjacent sales, Revision 1 confirms the Fish EA's conclusion that implementation of Alternative "will not contribute to a loss of viability or Federal listing of the California spotted owl." Revision 1, at 3.

The Cumulative Effects Analysis (CEA) and Biological Evaluation (BE) prepared for the Fish timber sale (Appendix E, [1993] Fish EA) documented the history of survey for spotted owls.... Location of the Fish analysis area is similar to the Casa-Guard and Jack sales, at the southeastern edge of the spotted owl's range in the Sierra Nevada. Habitat in the area grades into eastside Sierra pine, pinyon juniper and sagebrush, all of which are considered unsuitable for the California spotted owl. There are no known territorial spotted owls in the project area, adjacent owls are widely scattered and do not support a population base of consequence to other populations of spotted owls. *Management for future spotted owl habitat in this area is not a high priority or significant to maintenance of viability of the spotted owl.*

Revision 1, at 2 (emphasis added). Revision 1 concluded that Alternative 4 would preserve any potential for future habitat:

Under CASPO prescriptions, a minimum of 40% of the existing basal area of the largest trees available would be left in select habitat. Using Forest averages of basal area/acre and tree diameter distribution for similar stands, this would result in leaving approximately 14 large trees/acre. In "other" habitat, a minimum of 50 sq ft BA/acre or 5 large trees/acre would be left. Harvest in nonclassified habitat would not be restricted.

Commercial thinning in most cases would fully meet CASPO guidelines. Shelterwood and group selection harvest would meet the general intent of the CASPO guidelines but would harvest trees over 30" dbh and would not leave the "largest" trees available. Large trees would remain well distributed over the stand basis, which allows harvest under group selection or shelterwood prescriptions as long as basal area requirements over a larger area and trees over 30" dbh are retained.... Harvest areas would retain habitat elements for future management through advanced reproduction, leave trees, wildlife snags, down logs and wildlife clumps.

Revision 1, at 3. In reviewing past cumulative effects, Revision 1 expressed doubt

**8.** For example, according to Mr. Sisco, a female was recently found in the Ruby sale area incubating eggs in a white fir snag approximately 4 feet in diameter with a broken top and depression. Sisco opines that such large nest trees and cavities are not likely to be found in younger forests. Sisco Declaration, at ¶ 22; CASPO, at 24 (pur-

pose of report is to "arrest the decline of very large, old trees").

**9.** These members are Dr. Jared Verner, Dr. Kevin McKelvey, and Gordon Gould.

whether the Fish sale area had been suitable habitat, before tree harvesting:

> The CEA also reviewed 1940 aerial photos to determine what the area looked like prior to any commercial harvest. It concluded that, even at that time, the 1,900 acres of potentially suitable habitat was heavily fragmented and in small stands such that it would have been unlikely to support breeding owls. Analysis of the habitat in the adjacent unmanaged Golden Trout and South Sierra Wilderness Areas also indicates a lack of suitable habitat and bolsters the conclusion that the project and surrounding area are not capable of supporting a significant population of California spotted owls.

Revision 1, at 2. Regarding reasonably foreseeable future effects, the FONSI issued after Revision 1 concludes:

> The analysis in Revision 1 to the Fish EA supports and confirms the findings of the Decision Notice and Finding of No Significant Impact for the Fish Timber Sale signed February 24, 1993. With no known territorial owls in the area, poor habitat quality, and lack of connectivity to adjacent populations, it is clear there will be no significant impact to the California Spotted Owl as a result of this project.

The review team's conclusions, attached as Exhibit A to Revision 1, were incorporated in a report dated September 9, 1993, and a Supplemental Environmental Impact Statement (SEIS) for the Casa–Guard sale. Regarding the Casa–Guard and Jack timber harvests, the review team found:

> ... The project area does not appear to be important to future management of the California spotted owl. Large tree elements will remain well distributed over the entire sale area and maintain operations for future management for mature forest species.

Casa–Guard Supplement, at 8. The review team based its conclusion in part on the following:

Habitat consists of extensive, relatively open, old red fir and high-elevation mixed-conifer forests. Canopy cover over the full analysis area probably averages less than 40%. Little understory exists, and a shrub layer is generally meager to nonexistent. We concluded that the habitat is generally not suitable for spotted owls, based on our collective experience with spotted owl habitat over most of the rest of California. This conclusion, and the very low rate of owl detections, lead us to believe that *the forest in and around the Casa–Guard and Jack sales is what ecologists refer to as a "sink habitat" for the owls. That is, the birds can subsist there, but they cannot maintain a self-sustaining population.*[10] Maintenance of a population there depends on regular immigration of owls from other areas with suitable breeding habitat. This conclusion, too, indicates that the spotted owl is not a substantive issue for these two sales.

Suppl. AR 59 (emphasis added).

Attached to the Casa–Guard SEIS, and in turn Revision 1, is a letter authored by Jared Verner, Kevin McKelvey, and Gordon Gould, dated September 22, 1993, former members of the CASPO team. According to that letter, these three scientists evaluated the combined effects of the Casa–Guard, Jack, Cottonwood and Golf sales on the Sequoia National Forest. Putting aside the question of whether the sales conformed with CASPO, the team evaluated the effect on the spotted owl. In evaluating the Casa–Guard and Jack sale areas, the team concluded that "the habitat is not generally suitable for spotted owls," indicating that "the spotted owl is not a substantive issue for these two sales."

Defendants submit the declaration of Steven Anderson, which states that the natural limitations of rock outcrop, brushfields and relatively open timber stands constrain the sale area's potential to become suitable habitat. Anderson Declaration, at ¶ 6d (June 30, 1994). Mr. Anderson states:

---

10. According to Dr. Jared Verner:

If sinks attract and hold otherwise highly fit individuals, so that they never enter the effective breeding population, the sinks can actually contribute to the decline and actual loss of the overall population.

Verner Declaration, at ¶ 6c.

Large trees alone do not make an area suitable for spotted owls.... Except for large trees, all the other necessary components of suitable habitat are deficient in the Fish Timber sale.

Id., at ¶ 2a. Mr. Anderson points out that the area is "fragmented" not due to commercial harvesting, but due to natural conditions, such as rock outcrops, brushfields, and relatively open timber stands, conditions that would not be changed by further harvesting. Id., at ¶ 6a. Mr. Anderson also points out that the Fish sale area is not "next to" Gap B, but is twenty-four miles away, on the other side of the Sequoia Forest. Id., at 2j.

Dr. Jared Verner states that Mr. Sisco's criticisms of the failure to survey the entire Fish sale area is rebutted by the fact that some of the sale area is rock outcrops or brushfields, which are clearly unsuitable habitat, and a "waste of time" to survey. Verner Declaration, at ¶ 3; *see also,* Declaration of Teresa M. Ritter, at ¶ 2d, 2e ("[P]rotocol only requires survey of spotted owl habitat;" "[t]here is no sound biological reason for surveying unsuitable habitat such as rock outcrops and brush fields"). Mr. Anderson takes issue with Mr. Sisco's assertion that the owl surveys were not according to protocol, because protocol permits the six-visit requirement to be spaced over two years, and that owls are detectable into September. ¶¶ 7c, 28; *see also,* Ritter Declaration, at ¶¶ 2d, 2e, 15e. (no requirement that visits must be complete by June 15th, but two should be attempted by June 30th; protocol has been revised to require six surveys over a two year period due to need for increased reliability). Ms. Ritter states the surveys were conducted in strict conformity with protocol, attaching copies of written protocol to demonstrate that the Forest Service permits six surveys over a two year period. Ms. Ritter states that 90% of the Fish sale area, and surrounding 1.3 mile area, was ultimately surveyed. Regarding the late start for surveys in 1991, Ms. Ritter asserts that, due to snowy conditions, vehicles could not leave the main roads in May to get to survey areas, and that walking in snow at night to reach survey areas was unreasonable from a safety standpoint. ¶ 17.

A photograph of the proposed SOHA within the Fish sale area demonstrates that, except for a band of young trees, the forest is very open. Suppl.Declaration of Ray Huber, ¶ 7, and attached photograph 5.

Defendants submit the declaration of Dr. Jared Verner, prepared during October, 1993, and another prepared July 8, 1994, addressing Mr. Sisco's comments on the Fish sale area. Dr. Verner states that plaintiff's argument that the Kern Plateau is unlikely to sustain an owl population for at least two reasons: First, only 20% of the combined Casa–Guard, Jack and Fish sale areas is suitable habitat. 1994 Verner Declaration, at ¶ 6a. No nesting habitat has been observed in landscapes of 20% or less suitable habitat. Id. Second, the elevation in the combined Casa–Guard, Jack and Fish sale areas range from 7,000 to about 9,600 feet. Only 2% of the combined elevation is below 8,200 feet.

... [T]he highest elevation at which we have found evidence of nesting by spotted owls is either of our demographic study areas (Sierra National Forest and Sequoia/Kings Canyon National Parks) is about 8000 feet (Clover Creek owl site in Sequoia National Park—fledglings located at 7920 feet; adults never observed over 8050 feet). Our demographic study areas do not have an upper elevational limit; we search for owls well above these limits. The highest elevation of any nest located on the Sierra National Forest by Forest personnel is 775–feet. And the highest elevation of any nest ever found on the Sequoia National Forest is about 8000 feet....

Verner Declaration, at ¶ 6b. Much of area with sufficient canopy cover is lodgepole pine forest, in which spotted owls have never been observed to nest. ¶ 6b. These factors, according to Dr. Verner, account for the fact no nesting activity has been observed in the combined sale areas, and that the area is considered a "sink." ¶ 6b.

Mr. Anderson acknowledges that Department of Fish and Game databases demonstrate that three owl sightings occurred that were not discussed in the Fish EA: 1) In 1987, approximately 1.5 miles from the nearest timber harvest unit; and 2) In 1989, two

sightings were adjacent to the southwest boundary of the Fish sale. Mr. Anderson states that these sightings cannot affect the analysis, because neither involved resident owls or owl pairs. ¶ 7b. Mr. Anderson also takes issue with the assertion that the spotted owl is a proper indicator species [11] for the sale area, because spotted owls have never been abundant on the Kern Plateau. ¶ 8a. Ms. Ritter states that the Kern Plateau is not next to Gap B, as Mr. Sisco asserts, but is over twenty-four miles away. ¶ 9a.

Ms. Ritter states that two spotted owls were seen two miles from the nearest Fish timber sale unit in 1989, in an owl nest site near the Dark Canyon nest site. Ritter Declaration, at ¶ 18. Ms. Ritter states that those owls are likely part of the Dark SOHA, a 1,000 acre habitat.

 Unlike the Casa–Guard and Jack sales, here the defendants have prepared an environmental assessment considering the effects of CASPO on the proposed harvest, and incorporated a biological evaluation and cumulative effects analysis of the sale area and the surrounding 1.3 miles. *See,* AR 385. In *Greenpeace Action,* 14 F.3d at 1332, the parties agreed that the depletion of pollack, and pollack fishing, led to the decline of the sea lion, a threatened species under the ESA. After announcing new management options for pollack fishing the Fisheries Service prepared two biological opinions and two new environmental assessments, to determine the effect of these new options on the sea lion. One environmental assessment noted that possibility that fewer pollack had been available under the new management options, which may have led to the decline of the Stellar sea lion. The Ninth Circuit stated that the proper inquiry was this: Assuming the management options had some adverse impact on the sea lion, the court's task was to determine whether total impact on the sea lion "would be too minor to warrant an impact statement." *Id.* at 1332. *Greenpeace Action* determined that there was "no complete failure" to consider crucial factors in the Fisheries Service's decision not to prepare an EIS.

To set aside the Service's determination in this case would require us to decide that the views of Greenpeace's experts have more merit that those of the Service's experts, a view we are unqualified to make.

*Id.* at 1333.

Here, the evidence shows that Alternative 4's effect on the future of the California spotted owl is too minor to warrant an environmental impact statement. Plaintiff asserts that the Federal Defendants failed to consider various factors, but these assertions are refuted by either the record, or non-controversial evidence submitted by defendants. Plaintiff has not shown that a significant number of owls exist in the Fish sale area, nor that any number could do so, given the terrain and elevation. Plaintiff criticizes the methods used to count members of the owl population, but the copy of Forest Service protocol demonstrates that the methodology developed was followed. Although plaintiff argues that the Fish sale area is near owl population centers, the defendants point out that such centers are in fact distant. The record evidences that the Forest Service adequately considered not only impacts on the human environment, but extensively studied the potential effect on the California spotted owl. The crucial factors have been considered. *See also, Inland Empire,* 992 F.2d at 981–82 (environmental assessment which considered past and reasonably foreseeable logging was not arbitrary and capricious, in violation of NEPA, for failure to prepare an EIS).

Here, the Forest Service has concluded, after soliciting public comment and preparing two environmental assessments which considered Alternative 4 in light of CASPO, that the spotted owl would not be adversely affected in the Fish sale area, because that area is not conducive to long-term habitat. The Forest Service relied upon a cumulative effects analysis which considered the effects on the California spotted owl, in light of past harvesting. Scientists have concluded that the Fish sale area is incapable of becoming a long-term, viable habitat. The Forest Ser-

---

11. Indicator species are selected "... because their population changes are believed to indicate

the effects of management activities." 36 C.F.R. § 219.19(a)(1).

vice evaluated this information in light of all proposed alternatives.

NEPA does not require courts to resolve disagreements among various scientists as to methodology. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). Where the agency has already prepared an EA and has concluded that no EIR is necessary, that decision may be deemed arbitrary and capricious only where the government fails to address crucial factors, consideration of which is essential to a truly informed decision. *Greenpeace Action,* 14 F.3d at 1333, *citing, Foundation for North American Wild Sheep v. United States,* 681 F.2d 1172 (9th Cir.1982). Differences as to methodology are insufficient to justify preliminary injunctive relief. *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 980–81 (9th Cir.1993). Plaintiff's criticisms focus on methodology, and other criticisms are—to a large degree—refuted by the Federal Defendants' evidence. Revision 1, a second environmental document, bolsters the original DN/FONSI's conclusions.

Judicial review under NEPA does not involve second-guessing an agency's reliance on its experts; "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861.

"Once [courts] are satisfied that an agency's exercise of discretion is truly informed, we must defer to that informed discretion." *Marsh,* 490 U.S. at 378, at 377, 109 S.Ct. at 1861, at 1861; *Greenpeace Action,* 14 F.3d at 1332. Deference is particularly appropriate in the present case—defendants rely on declarations and conclusions in the administrative record submitted by Dr. Jared Verner, who was the leader of the CASPO technical assessment team. Two other members of the CASPO team—Kevin McKelvey and Gordon Gould—contributed to and joined with Dr. Verner's conclusions in the Casa–Guard SEIS. NEPA does not require the Federal Defendants' to choose an alternative based on CASPO. "NEPA merely prohibits uninformed—rather than unwise—agency ac-

tion." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). Plaintiff's have not shown a likelihood of success on the merits of their NEPA claim.

### Balance of the Hardships

■ Plaintiffs contend immediate and irreparable harm will occur if the Fish Sale proceeds to harvest, pointing out that, once felled, trees that have grown for several hundred years cannot be easily replaced, and species dependant upon old growth forests could be injured. *See, Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (environmental injury, by its nature, is seldom adequately remedied by money damages). Sierra Forest Products, states that it will suffer some harm if the sales are enjoined, noting that much of its timber purchases are on hold due to pending litigation. Duysen Declaration, at ¶¶ 2, 3.

Environmental injury is not amenable to remediation by money damages. In general, when such injury is threatened, the balance of harm favors injunctive relief. *Amoco Production Co.,* 480 U.S. at 545, 107 S.Ct. at 1404. Plaintiff's claim for permanent injunctive relief would be mooted by the denial of a preliminary injunction, because the timber sale would likely have proceeded to harvest by the time the case proceeds to trial.

Because plaintiff fails to show that little effect on the spotted owl will be achieved by delaying the sale, the balance favors withholding injunctive relief.

### Public Interest

■ Without a likelihood of success on the merits, the public interest does not favor granting injunctive relief.

## Breach of Contract

### Likelihood of Success

■ The settlement agreement in *Tulare County Audubon Society v. United States,* CV–F–90–564–EDP (E.D.Cal.), states that defendants agreed:

> ... that prior to the decision to re-offer the Fish Timber Sale, the Forest Service will prepare an environmental document (a

new environmental assessment or an environmental impact statement, as appropriate) for the Fish Timber Sale area which will include analysis of the surrounding relevant areas of the Sequoia National Forest.

Defendants also agreed that:

The environmental document prepared for the Fish Timber Sale will comply with the National Environmental Policy Act and will, at a minimum, contain a discussion of all issues set forth in Sections P.3.a. through P.3.p. and Sections Q.3.h. of the Sequoia National Forest Mediated Land Management Plan 1990 Settlement Agreement.

The parties dispute the proper standard for evaluation of compliance with the settlement agreement. Plaintiff argues the arbitrary and capricious standard of the APA is no longer applicable, but that a more rigorous standard of review should be applied, citing *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 90–91, 118 N.E. 214 (N.Y.1917) ("reasonable efforts" implied contractual term). Plaintiff argues it is reasonable to believe that the Fish timber sale may or could reduce options for the spotted owl, the EIS is therefore "appropriate" and must be prepared to meaningfully consider CASPO, but also the cumulative impacts of all sales on the Kern Plateau. The Federal Defendants argue the proper standard of review is arbitrary and capricious, because the contract permits the Forest Service to determine the type of environmental document to be prepared "as appropriate" under NEPA.

The contract does not compel an EIS, only an environmental document which complies with NEPA. Under either an arbitrary and capricious, or reasonableness standard of review, plaintiff has not shown that the defendants violated the settlement agreement. Defendants have prepared *two* environmental documents assessing the impact of Alternative 4 on the California spotted owl, including a biological evaluation and cumulative effects analysis. Although plaintiff has attempted to point to flaws in these documents, those criticisms are rebutted by the administrative record and defendants' submitted evidence. Plaintiff's strongest criticism—that no long-term survey information has been incorporated into the Fish EA's—is undercut by plaintiff's failure to demonstrate that such long-term data exists. Agency experts have concluded that the Kern Plateau is not a suitable long-term habitat because it is above elevational limits, and lacks areas of suitable canopy or the appropriate type of forest. Plaintiff has not shown a likelihood of success on the merits that the contract was breached by failing to prepare an EIS on the Fish sale.

Plaintiff argues that the Fish EA fails to address certain issues required by the Mediated Settlement agreement and incorporated by reference into the settlement agreement in *Tulare County Audubon Society v. United States*, CV–F–90–564–EDP. Through the declaration of Arthur Colson, the Federal Defendant's response is that these issues are addressed by the Fish EA, supported with citations to the administrative record:

| PROVISION | SUBJECT | RECORD CITE |
|---|---|---|
| P(3)(e) | State estimated cost of project-related mitigation or funding source for mitigation | AR 312. |
| P(3)(f) | Statement of revenues from sale | AR 288. |
| P(3)(k) | Map of mitigation project; sttmt of expected mitigation funding | AR 312, 534-58. |
| P(3)(l) | Identify lands unsuitable for timber harvesting w/i sale area | AR 443-45. |
| P(3)(o) | Include statement of site-specific effects of proposed projects on changes in downstream sedimentation and downstream fish habitat | AR 267-76, 308-19, 356, 360-62, 365-83, 471-91, 492-587. |

A review of the cited portions of the record show the following:

*P(3)(e):* Although the record shows that mitigation will be through "KV funding," or Knutson–Vandenberg Act funds (16 U.S.C. § 576), the cited portions do not enumerate the estimated cost of reforestation and project-related mitigation.

*P(3)(f):* AR 288 states that "Qualifying timber sale receipts generated by [Alternative 4] are expected to return approximately $163,625 to Fresno, Kern, and Tulare Counties. There would be a positive Benefit/Cost Ration of 2.6 and a Present Net Value of approximately $654,500 for this alternative." The Fish EA was prepared before the bid process. Mr. Colson's declaration states that, according to actual high bid received from the sale, the net revenue is $706,881. Colson Declaration, at ¶ 16b. This satisfies P(3)(f)'s obligation to disclose "estimated revenues from the sale."

*P(3)(k):* The cited portions of the record refer to the Watershed Working papers, containing inventory statements for watershed condition inventories for water and soil improvement, and sketches of affected watershed areas. AR 312 states the source of funding. This information adequately discusses mitigation measures and the source of funding.

*P(3)(1):* AR 443–45 contain tables stating a total amount of steep and rocky areas within the Fish sale area, which are stated to be insufficient for timber production. This information adequately identifies lands unsuitable for timber harvesting within the sale area.

*P(3)(o):* The cited portions of the record are an adequate statement of the site-specific effects of changes in downstream sedimentation and downstream fish habitat.

Plaintiff has not submitted evidence or argument that details any insufficiencies in the references to the administrative record cited by defendants. Plaintiff has not established a likelihood of success on the merits of the breach of contract claim.

**Balance of Hardships/Irreparable Injury**

The analysis discussed for plaintiff's NEPA claim is equally applicable here. The

balance of hardships does not favor injunctive relief.

**Public Interest**

Without a likelihood of success on the merits, the public interest does not favor granting injunctive relief.

**National Forest Management Act**

**Likelihood of Success**

 Under the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1604 *et seq.*, the Secretary of Agriculture is required to establish a comprehensive Land and Resource Management Plan ("LRMP") for each national forest. In promulgating the LRMPs, the Forest Service must assure "multiple use" and sustained yield of the "products and services" obtained from the national forests in accordance with the Multiple–Use Sustained–Yield Act of 1960 ("MUSYA"). 16 U.S.C. §§ 528–531; 16 U.S.C. 1604(e)(1). Permissible uses include the management of outdoor recreation, range, watershed, wildlife, fish and timber. 16 U.S.C. § 1604(e)(2). With respect to timber resources, MUSYA and NFMA dictate that the Forest Service harvest only that amount of timber which it can replace, i.e., that harvesting be set at sustainable levels.

Plaintiff's complaint alleges defendants have violated the NFMA, by failing to consider recent scientific information regarding the spotted owl. Complaint, at ¶ 36. 16 U.S.C. § 1604(g)(3)(B) requires the Secretary to promulgate regulations that specify guidelines for land management plan, to provide for diversity of plant and animal communities, in order to meet overall multiple use objectives. 36 C.F.R. § 219.26 requires forest plans to "provide for diversity of plant and animal communities and tree species consistent with the overall multiple use objectives of the planning area." "Diversity" is defined as "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3. 36 C.F.R. § 219.19 provides, "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrae species in the planning area." The complaint alleges

defendants have failed to obtain adequate wildlife indicator data of timber, soil, and wildlife resources. 16 U.S.C. § 1604(g)(3)(C) requires regulations to be promulgated to insure research on the effects of each management system, to avoid substantial and permanent impairment of productivity of the land. 36 C.F.R. §§ 219.12(d) requires each Forest Supervisor to obtain and keep current data for planning and managing the resources under his or her administrative jurisdiction. Plaintiff does not challenge the entire Sequoia Forest Plan.

The Federal Defendants argue that plaintiff's NFMA claim is not cognizable, based on this court's earlier ruling that 16 U.S.C. § 1604(g) of the NFMA, and various subsections under 36 C.F.R. § 219, apply solely to the promulgation and management of forest plans, not individual timber sales. *Tulare County Audubon Society,* CV–90–628–OWW, at 15–17 ("By their express terms, both § 1604 and the various subsections of 36 C.F.R. § 219 raised by plaintiffs relate only to the promulgation of "forest management plans," not to specific timber sales.").

Although the Ninth Circuit has not addressed the issue, since this court's earlier decision, the Eighth Circuit has held that a challenge to the Forest Service's district decision was not cognizable under 16 U.S.C. § 1604(g), and 36 C.F.R. §§ 219.19 and 219.27, because only challenges to regional guides or forest plans may be brought under those provisions. *Sharps v. U.S. Forest Service,* 28 F.3d 851 (8th Cir.1994). *Sharps* lends further support to the analysis in *Tulare County Audubon Society,* CV–90–628–OWW. Plaintiff has not shown a likelihood of success on the merits of the NFMA claim.

The NFMA dictates that the Forest Service prepare the LRMPs in accordance with NEPA. 16 U.S.C. § 1604(g)(1). To the extent that plaintiff's claim can be construed as a challenge to the Forest Service's failure to supplement the LRMP EIS, that claim has been determined coextensively with plaintiff's NEPA claim, previously discussed.

**Balance of Hardships/Irreparable Injury**

Because plaintiff has not shown a likelihood of success on the merits, the balance of hardships does not favor injunctive relief.

## Public Interest

Without a likelihood of success on the merits, the public interest does not favor granting injunctive relief.

## VI.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sierra Forest Products and the Federal Defendants have filed motions for summary judgment, raising similar issues with respect to plaintiff's complaint. Because the issues raised by both motions are similar, they may be determined together.

### Legal Standard

■ When the court reviews an agency decision, the standard for summary judgment is modified by 5 U.S.C. § 706(2). The question is not whether there is a genuine issue of material fact, but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole. *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979). The exact nature of review is whether the issue is one of fact or of law. The factual findings of an agency are entitled to substantial deference. 5 U.S.C. §§ 706(2)(A) & (E). Because courts are final authorities on questions of statutory interpretation, legal issues, including questions of statutory construction, are reviewed de novo. *Blackfeet Tribe v. U.S. Department of Labor,* 808 F.2d 1355, 1357 (9th Cir.1987). In some circumstances, the agency's interpretations of governing statutes and regulations is entitled to deference. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 847–48, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

The scope of review provisions APA § 706(2) are cumulative. *Ass'n of Data Processing v. Board of Governors of Federal Reserve System,* 745 F.2d 677, 683 (D.C.Cir. 1984). An agency action which is supported by the required substantial evidence may in another regard be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See id.* Agency action will be set aside as arbitrary and capricious if the agency lacked support in the administrative record for its factual assumptions or otherwise abused its discretion—for example where there is an abrupt and unexplained departure from agency precedent. *See id.*

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. The agency must articulate a "rational connection between the facts found and the choice made." "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, * * * we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, at 285–286, 95 S.Ct. 438, at 442, 42 L.Ed.2d 447 (1974).

### NEPA Claim

■ The Federal Defendants argue the Fish EA meets NEPA requirements, because it adequately considered CASPO guidelines, and there is insufficient evidence that spotted owls live in the Fish sale area, nor is there sufficient habitat for their survival if one should appear. The Federal Defendants argue the Fish timber sale will not have a significant impact on spotted owls, because the location does not support an owl population, is unsuitable to do so, and is not in an area important to owl viability.

Although this case was recently filed, the Federal Defendants argue that summary judgment is appropriate because the case is limited to the administrative record, relying on *Friends of Endangered Species, Inc. v. Jantzen,* 589 F.Supp. 113 (N.D.Cal.1984), *aff'd,* 760 F.2d 976 (9th Cir.1985). The *Friends* court granted defendant's motion for summary judgment on plaintiff's NEPA

claim, finding that no genuine issue of fact existed that an EIS must be prepared:

> It is not the duty of this court to pass on the scientific merits of the decision of the FWS. To succeed in such an argument, then, plaintiff's evidence would have to [be] overwhelming enough to show that the FWS acted "arbitrarily and capriciously," 5 U.S.C. § 706 ... The evidence presented here is not convincing enough to support such a conclusion.

*Id.*, 589 F.Supp. at 119. In affirming, the Ninth Circuit noted the absence of a genuine issue of material fact:

> [V]irtual agreement exists among local, state and federal government officials, private parties, and local environmentalists on the development of the Mountain and on the content of the EIR/EA. Only appellant and its two experts are critical of the Biological Study on which the development plans are the EIR/EA are based.

According to the administrative record and evidence submitted, the Forest Service does not consider the Fish sale area capable of sustaining an owl population. For the reasons analyzed above, plaintiff has failed to provide evidence demonstrating that the defendants' actions were arbitrary and capricious, such that NEPA was violated. Defendants' motion for summary judgment on plaintiff's NEPA claim is GRANTED.

**Breach of Contract Claim**

 As previously discussed, the administrative record and the terms of the contract itself support a finding that defendants have not breached the settlement agreement by relying on the EA, or in failing to prepare an EIS. Nor has plaintiff submitted argument or evidence refuting defendant's citations to the record, to demonstrate that other aspects of the settlement agreement were breached.

Defendants' motion for summary judgment on plaintiff's breach of contract claim is GRANTED.

**NFMA Claim**

 An NFMA claim cannot be brought to challenge an individual timber sale. *Tulare County Audubon Society*, CV–90–628–OWW. To the extent plaintiff has stated a claim challenging the NFMA's requirement that LMRP's be supported by an EIS, the record supports a finding that the defendants complied with that requirement.

Defendant's motion for summary judgment on plaintiff's NFMA claim is GRANTED.

## VII.

### CONCLUSION

1) The Federal Defendants' motion to strike the declaration of Charles Sisco is DENIED.

2) The Federal Defendants' motion to strike the declaration of Ms. Cloer is GRANTED, in part. That declaration cannot be used to require the Federal Defendants to prepare an EIS, without any consideration that the Fish EA may have satisfied NEPA requirements, nor may it be used to modify the unambiguous contract in dispute.

3) Defendants' motion to dismiss plaintiff's complaint for lack of standing is DENIED.

4) The claims of Plaintiffs Environment Now!, Plumas Forest Project and Forest Alert are DISMISSED.

5) Plaintiff's motion for a preliminary injunction is DENIED.

6) Defendants' motions for summary judgment are GRANTED.

7) Defendants shall prepare an order and judgment conforming with this opinion, and the requirements of Federal Rule 52(a), and lodge it with the court within five (5) days of service of this Memorandum Opinion.

SO ORDERED.