SAN LUIS & Delta–Mendota Water
Authority, Plaintiffs,

v.

Anne BADGLEY, et al., Defendants.

No. CV–F–99–5658 OWW.

United States District Court,
E.D. California.

June 28, 2000.

Thomas William Birmingham, Daniel J. O'Hanlon, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, for Plaintiffs.

Jane P. Davenport, Matthew A. Love, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT; DEFENDANTS' MOTION TO STRIKE; PLAINTIFFS' MOTION TO SUPPLEMENT THE RECORD

WANGER, District Judge.

### I. *INTRODUCTION*

This matter is before the Court on various motions to determine a challenge to the United States Fish and Wildlife Service's ("USFWS") final rule listing the Sacramento splittail ("splittail") as a threatened species under the Endangered Species Act ("ESA"). In November 1999, the parties submitted cross-motions for summary judgment. *See* Docs. 36, 40. With their summary judgment motion, Plaintiffs' filed the declaration of Dr. Charles Hanson. *See* Doc. 38. As exhibits to his declaration, Dr. Hanson included calculations he made using the 1998 abundance indices data included in the Administrative Record regarding splittail population trends. *See* Hanson Decl. ¶ 4. Defendants moved to strike the declaration of Dr. Charles Hanson and all the references to it in Plaintiffs' brief because his study was not part of the administrative record. *See* Doc. 58. Plaintiffs op-

posed this motion and moved to supplement the record, *see* Doc. 53, to which Defendants replied, *see* Doc. 68.

## II. *LEGAL STANDARD*

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see Maffei v. Northern Ins. Co. of New York,* 12 F.3d 892, 899 (9th Cir.1993). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.), *cert. denied,* 516 U.S. 912, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.), *cert. denied,* 516 U.S. 1043, 116 S. Ct. 700, 133 L.Ed.2d 657 (1996). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. A court's role on summary judgment, however, is not to weigh the evidence, *i.e.,* issue resolution, but rather to find genuine factual issues. *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407,.410 (9th Cir.1996).

 Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996); *Anheuser–Busch, Inc. v. Nat'l Beverage Distributors,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *United States v. One Parcel of Real Property,* 904 F.2d 487, 491–492 (9th Cir. 1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R.Civ.P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom. Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

## III. *BACKGROUND*

### A. *UNDISPUTED FACTS*

On February 8, 1999, USFWS published its final rule listing the splittail as a threat-

ened species pursuant to the ESA. *See* Def. Facts ¶ 1, Pl. Facts ¶ 1. The splittail is a large cyprinid fish, *see* Pl. Facts ¶ 3, Def. Facts ¶ 3, which is a member of the minnow family, *see* Pl. Facts ¶ 4, Def. Facts ¶ 4. Splittail are dull, silvery-gold on the sides and olive-gray on their backs. *See* Pl. Facts ¶ 4, Def. Facts ¶ 4. The name "splittail" refers to the distinctive tail of the fish. *See id.* "Adults are characterized by an elongated body, distinct nuchal hump on the back of the neck, and a small blunt head, usually with 'barbels' at the corners of the slightly subterminal mouth." *See id.* A splittail is distinguishable from other minnows in California's Central Valley because it has an enlarged dorsal lobe of the caudal fin. *See id.* Splittails are native to Central California and are relatively long-lived, often reaching 5 to 7 years of age. *See* Pl. Facts ¶ 5, Def. Facts ¶ 5.

USFWS first identified the splittail as a candidate species for possible listing as endangered or threatened in early 1989. (Def. Facts ¶ 6, Pl. Facts ¶ 6) In November 1992, USFWS received a petition asking that the splittail be added to the list of endangered and threatened wildlife and that habitat be designated for the splittail in the Sacramento and San Joaquin rivers and associated estuary. (Def. Facts ¶ 7, Pl. Facts ¶ 7) USFWS published a 90–day finding on July 6, 1993 that the requested actions may be warranted and initiated a review of the splittail. (Def. Facts ¶ 8, Pl. Facts ¶ 8)

On January 6, 1994, USFWS published a proposed rule to list the splittail as threatened. (Def. Facts ¶ 9, Pl. Facts ¶ 9) The first sixty-day comment period on this rule was January 6 to March 7, 1994. (Def. Facts ¶ 15, Pl. Facts ¶ 15) On August 3 and 31, 1994, the State Water Contractors and Central Valley Water Association, respectively, wrote USFWS requesting a 6–month extension alleging scientific dis-

agreement with the listing proposal. (Def. Facts ¶ 16, Pl. Facts ¶ 16) In response, on January 10, 1995, USFWS published in the Federal Register a notice of a six-month extension and reopened a forty-five day public comment period until February 24, 1995. (Def. Facts ¶ 17, Pl. Facts ¶ 17)

In April 1995, Congress imposed a moratorium on the processing of all final listing proposals. (Def. Facts ¶ 18, Pl. Facts ¶ 18) This moratorium was lifted April 26, 1996. (Def. Facts ¶ 18, Pl. Facts ¶ 18) In March 1998, the California Department of Water Resources ("CDWR") and the State Water Contractors requested another reopening of the comment period. (Def. Facts ¶ 19, Pl. Facts ¶ 19) A third comment period was opened for sixty days from May 18, 1998 to July 17, 1998. (Def. Facts ¶ 20, Pl. Facts ¶ 20)

During the third comment period, three California state entities, the California Department of Fish and Game "CDFG," *see* A.R. 2157–83, CDWR, *see* A.R. 2185–2207, and the Resources Agency of California, *see* A.R. 420–24, objected to the listing. CDFG expressly recommended that the splittail not be listed. *See* A.R. 2157. It found the "geographic distribution of splittail is much broader than previously believed and continues to expand as more information is gathered," *id.;* and the data suggested 1998 "will be another exceptional production year for splittail," *id.* at 2158. CDWR found that "[d]espite the low 1996 indices, the adult stocks ... continue to show no indication of a long-term decline similar to that observed for age–0 splittail during drought conditions in 1987–1992 and 1994." A.R. 2186. The 1997 adult abundance data suggested that "the strong 1995 year class successfully recruited to the spawning stock." *Id.* Further, it found that there was good evidence that 1998 was "an exceptionally strong year-class," and that the 1998 abundance would "be among the best levels ever recorded." *Id.*

at 2187. CDWR concluded that "the splittail population has retained its resiliency;" the 1998 data "demonstrate that the population has retained the broad distribution observed in 1995," and in the Sacramento and San Joaquin Rivers, the range may be broader; and that "inundation of floodplain areas results in spawning success." *Id.* at 2189. As to the Resources Agency of California[1], Secretary for Resources Douglas Wheeler, argued that the evidence that justified "withdrawal of the Service's proposed regulation to list the splittail under the Endangered Species Act." *See id.* at 420.

On May 29, 1998, the Southwest Center for Biological Diversity, an environmental citizen organization filed a citizen suit in the Southern District of California alleging that USFWS had failed to timely make a final determination regarding the splittail. (Def. Facts ¶ 21, Pl. Facts ¶ 21) The court ordered Interior to: (1) "comply with Section 4's listing requirements by February 1, 1999," *Southwest Center for Biological Diversity v. Babbitt*, No. 98–1009–IEG (POR), at 13:8–9; (2) "propose a rule designating critical habitat within one year from the date on which [the] Order is marked 'filed,'" *id.* at 13:10–11; and (3) "comply with the relevant provisions of 16 U.S.C. § 1533(b)(6)(C) within two years from the date on which [the] Order is marked 'filed,'" *id.* at 13:11–12. The order was marked "filed" December 23, 1998. *See id.* at 1. On February 8, 1999, Interior published a final rule listing the splittail as "threatened." *See* AR at 1.

## B. *THE PRESENT DISPUTE*

Plaintiffs filed this action May 10, 1999 challenging the listing of the splittail as threatened. (Doc. 1) Plaintiffs make four claims. The first alleges USFWS failed to use the best scientific and commercial data available, in violation of 16 U.S.C. § 1533(b)(1)(A). (Compl.¶ 17) They contend USFWS ignored all pre–1980 and post–1992 data available and it used only selected survey data from the 1980–1992 period. (Compl.¶ 17) The second cause of action alleges USFWS violated 16 U.S.C. § 1533(b)(8) because it did not publish 1) a summary of the available data, 2) which data the Service considered, and 3) the relationship between the data and the decision. (Compl.¶ 22) Third, Plaintiffs allege a violation of 1531(c)(2), claiming USFWS failed to consult with an objecting state agency. (Compl.¶ 28) Finally, Plaintiffs claim that "[t]he Service's final rule was promulgated in a manner that is arbitrary, capricious, and not in accordance with law, and in excess of the defendants' statutory jurisdiction and authority, in violation of the APA, because the splittail does not meet the definition of a threatened species as set forth in the ESA." (Compl.¶ 35)

## IV. *DISCUSSION*

### A. *STANDING*

To establish standing, Plaintiffs bear the burden of showing they have: suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical..... In addition, petitioners must show that such injury is fairly traceable to the challenged action. Finally, they must show that it is likely that the injury will be redressed by a foreseeable decision.

---

1. The Resources Agency of California is comprised of, inter alia, the California Conservation Corps, the Department of Boating and Waterways, the Department of Conservation, the Department of Fish and Game, the Department of Forestry & Fire Protection, the Department of Parks & Recreation, and the Department of Water Resources. *See* A.R. 420.

*Northwest Environmental Defense Center v. Bonneville Power Administration,* 117 F.3d 1520, 1528 (9th Cir.1997) (citations omitted). Plaintiffs contend that they have standing under *Bennett v. Spear,* 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). *Bennett* concerned a biological opinion issued by USFWS in accordance with the ESA regarding the operation of the Klamath Irrigation Project by the Bureau of Reclamation, and the project's impact on two varieties of endangered fish. *See id.* at 157, 117 S.Ct. 1154. "[T]wo Oregon irrigation districts that receive[d] Klamath Project water and the operators of two ranches within those districts" filed suit against the regional director of USFWS and the Secretary of the Interior. *Id.* at 159, 117 S.Ct. 1154. The district court held that the irrigation districts and ranch operators lacked standing. *See id.* at 160–61, 117 S.Ct. 1154. The Ninth Circuit affirmed. *See id.* at 161, 117 S.Ct. 1154. The Supreme Court reversed, holding:

> Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured—for example, the Bureau's distribution of the reduction pro rata among its customers. The complaint alleges the requisite injury in fact.

*Id.* at 168, 117 S.Ct. 1154. Here, Plaintiffs are identically situated to the petitioners in *Bennett;* Plaintiffs contend they "face imminent injury to their SWP and CVP water supply because of the splittail listing." (Pl. Br. at 36:14–15) They claim the Service's view that "existing regulatory mechanisms are inadequate to protect splittail (A.R. 1:000012–14; 64 Fed.Reg. At 5974–76) reveal the Service's intention to impose further restrictions on project operations based on the listing of the splittail." (Pl. Br. at 36:18–19)

As further evidence of the Service's "intent" to reduce water deliveries to contractors, they provide the example of the Delta smelt. (Coburn Decl. ¶ 9) Under penalty of perjury, Mr. Coburn stated that after the Delta smelt was listed as a threatened species, which occurred in 1993, in mid-May 1999, "pumping operations at the SWP's South Delta plant were drastically curtailed [by USFWS] due to unexpectedly large entrainment of Delta smelt" (Coburn Decl. ¶ 9), and that these reduced pumping operations continued through the end of June 1999. (Coburn Decl. ¶ 9) As a consequence, "the SWP was unable to pump approximately 261,000 acre feet of water that otherwise would have been exported through the South Bay and California Aqueducts." (Coburn Decl. ¶ 9) Plaintiffs demonstrate the requisite injury in fact.

## B. *THE HANSON DECLARATION*

In support of its motion for summary judgment, Plaintiffs submit the declaration of Charles Hanson. Since the Hanson Declaration and its exhibits are extra-record materials, Defendants move to strike the declaration and the exhibits. They also move to strike the portions of Plaintiffs' summary judgment brief and separate statement of undisputed facts that refer to the declaration and exhibits. *See* Strike Br. at 1. As its opposition to Defendants' motion to strike, Plaintiffs moved to supplement the record so as to include the Hanson Declaration. *See* Strike Opp. at 3.

When a court reviews an agency decision, it "may consider information supplemental to the record only exceptionally." *Rybachek v. United States Environmental Protection Agency,* 904 F.2d 1276, 1296 n. 25 (9th Cir.1990). There are, however, circumstances "to justify expanding the record or permitting discovery." *Public Power Council v. Johnson,* 674 F.2d 791, 793 (9th Cir.1982). The broadest ex-

ception "permits expansion of the record when necessary to explain agency action." *Id.* Another exception arises "when it appears the agency has relied on documents or materials not included in the record." *Id.* at 794. A third exception is "to permit explanation or clarification of technical terms or subject matter involved in the agency action under review." *Id.* Finally, "courts can go beyond the agency record when agency bad faith is claimed." *Id.* at 795.

Plaintiffs argue supplementation is warranted for two reasons. First, it invokes the third exception listed above: "the Hanson Declaration explains technical terms and complex subject matter contained within the Administrative Record." (Strike Opp. at 4:8–10) Second, Plaintiffs argue the Hanson Declaration "presents important factors the Service failed to consider when listing the splittail." (Strike Opp. at 4:8–10) The declaration is also offered to explain agency action.

More specifically, Plaintiffs contend that the information in the Hanson Declaration "falls within one or both of the exceptions relied upon in *Environment Now!* " (Strike Opp. at 4:7–8) In *Environment Now! v. Espy*, 877 F.Supp. 1397, 1403–04 (E.D.Cal. 1994), this Court allowed supplementation of the record. Plaintiffs contend "the Hanson Declaration would serve the same purpose as the declaration admitted in the *Environment Now!* case." (Strike Opp. at 4:24–25)

At issue in *Environment Now!*, was a Forest Service plan for timber harvesting. *See id.* at 1401. The Federal Defendants opposed the introduction of an expert declaration to refute and explain the findings in the environmental documents prepared by the Forest Service. *See id.* at 1403. Ninth Circuit authority, *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 n. 22 (9th Cir.1992), recognizes it is appropriate to utilize expert analysis to understand a Forest Service computer program performed by its own expert witness even though the analysis was outside the record. Complex scientific analysis and data are in dispute. Moreover, the accuracy and credibility of the primary experts' analysis, on which the agency relies for its listing is seriously disputed. Plaintiffs' expert's analysis is necessary and will facilitate the Court's understanding of the technical issues.

*Environment Now!* found the expert's declaration helpful "in highlighting perceived deficiencies in the environmental review process," *Environment Now!*, 877 F.Supp. at 1404, and Plaintiffs allege such a deficiency here. In *Environment Now!*, the Forest Service study had been "the subject of on-going scientific study by teams of researchers, analyzing technical and complex environmental information." *Id.* Here, an even greater dispute exists over technically complex data, which calls into question the reliability and credibility of the agency's expert data about the threat to the smelt's survival. Part of Plaintiffs' expert's opinion concerns Defendants' failure to consider information, some of which was unavailable during the time of the administrative review, Plaintiffs' data were submitted to Defendants after the close of the third notice-and-comment period and only several days prior to a court-ordered decision date.

The time when the data were made available to Defendants is disputed. Defendants claim that on January 19 and January 20, 1999, the field supervisor of the USFWS Sacramento office received letters from CDWR and the SWC, respectively, that included new information about splittail abundance. (Def. Facts ¶ 22) Plaintiffs claim the abundance data were made available to USFWS at a January 13, 1999 meeting. (Pl. Facts ¶ 22) This was after the July 17, 1998 cut-off for commen-

tary. "[I]t is not 'appropriate … for either party to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision.'" *Rybachek v. United States Environmental Protection Agency*, 904 F.2d 1276, 1296 n. 25 (quoting *Association of Pacific Fisheries v. Environmental Protection Agency*, 615 F.2d 794, 811–12 (9th Cir.1980)). Although the rule stated in *Southwest* reads "[j]udicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision," 100 F.3d 1443, 1450, here, although the final decision was not made until February 3, the proximity was close enough.

Plaintiffs also address Defendants' argument that the agency is the proper source for supplemental information. It is true that in some cases, information from non-agency experts has been used to supplement the record. *See Environment Now!*, at 1404.

■ Defendants' request that the Court strike the entire Hanson declaration and all references to it throughout the papers. Not all of Dr. Hanson's opinions and data are objectionable. Exhibit A is Dr. Hanson's vita. Qualifications of experts must be submitted to establish their competence. *See* FED. R. EVID. 702. Defendants' motion to strike Exhibit A is DENIED. Exhibits B through D are Dr. Hanson's calculations and comparison of splittail population trends. These will be considered to explain and assist understanding the complex and technical subject matter underlying Interior's decision and the significance of the CDFG's and California Resource Secretary's objections to the listing. Defendants' motion to strike the Hanson declaration is DENIED. Plaintiffs' motion to supplement the administrative record is DENIED.

### C. *PLAINTIFFS' REQUESTS FOR JUDICIAL NOTICE*

Plaintiffs filed three requests for judicial notice. Two requests were made in support of their summary judgment motion. Judicial notice is requested of two documents distributed by the Department of the Interior at a November 9, 1999 workshop held by the U.S. Bureau of Reclamation and U.S. Fish and Wildlife Service. *See* Doc. 43. A second is for judicial notice of the Interagency Ecological Program web site, which posts real-time monitoring data on splittail in the Delta, and a National Marine Fisheries Draft Document regarding Salmonid. *See* Doc. 78. Defendants opposed this request. *See* 81. The final request asked judicial notice be taken of the docket sheet for *Southwest Center v. Babbitt*, No. 98–1009–IEG (POR) in support of its opposition to Defendants' summary judgment motion. *See* Doc. 55.

#### 1. *November 15, 1999 Request: Doc. 43*

The two documents distributed at a November 9, 1999 Bureau of Reclamation/Fish and Wildlife Service Workshop, are a November 4, 1999 memorandum entitled "Delta Export Reductions in December and January," *see* Doc. 43 Ex. A, and a November 4, 1999 memorandum entitled "Summary of Potential (b)(2) Fish Actions for Oct 99—Sep 2000 Water Year," *see* Doc. 43, Ex. B. Plaintiffs contend that both documents were prepared by the Department of Interior and distributed at a November 4, 1999 workshop held by the U.S. Bureau of Reclamation and USFWS to explain the proposed operations of the Central Valley Project for the period from October 1, 1999 through September 30, 2000.

■ Federal Rule of Evidence Rule 201 provides in pertinent part "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1)

generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. A court shall take judicial notice if requested by a party and supplied with the necessary information." Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992).

 Exhibit B is a summary of potential actions that the Bureau is considering to protect andromonous fish pursuant to the authority granted by § 3406(b)(2) of the Central Valley Project Improvement Act ("CVPIA"). The Bureau proposes using (b)(2) water in both December 1999 and January 2000 for "Delta actions," or "export reductions," to protect, *inter alia*, salmon. See Doc. 43, Ex. B at 1–2. Exhibit A discusses other species the Delta export reductions are designed to protect. The list includes the splittail. *See* Doc. 43, Ex. A at 2. Judicial notice is taken of the existence of Exhibit B, and that it was sponsored by the Department of Interior as of November 4, 1999 to support use of the (b)(2) water to help protect the habitat of the splittail. This bears directly on the issue of Plaintiffs' standing.

### 2. *February 14, 2000 Request: Doc. 78*

 This request consists of two exhibits. First is the Interagency Ecological Program ("IEP") web site, which posts real-time monitoring data on splittail in the Delta and contains the 1998 splittail data. Second is a January 6, 2000 draft document by the National Marine Fisheries, entitled "Viable Salmonid Populations and the Recovery of Evolutionary Significant Units." *See* Doc. 78, Exs. A, B. Defendants oppose this request on the ground

Plaintiffs are using another means to try to get the Court to consider information outside the record. *See* Doc. 81. Plaintiffs have not established the reliability and admissibility of these data, even if offered as "admissions." Plaintiffs' second request for judicial notice in support of their summary judgment motion is DENIED.

### 3. *December 13, 1999 Request: Doc. 55*

 Plaintiffs' final request is the docket sheet for *Southwest Center v. Babbitt*, No. 98–1009–IEG (POR). They introduce the docket sheet to demonstrate "the U.S. Fish & Wildlife Service never requested an extension of time to make its listing decision for the splittail in order to consider 1998 abundance and distribution data." Doc. 55 at 2:3–6. Citing *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994), they argue that "[j]udicial notice of Court records is appropriate to establish the fact of such litigation and related filings." *Jones* held that a court: "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *See id.* at 1553 (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir.1992)). Judicial notice is appropriately taken of the docket sheet.

## V. THE CROSS–SUMMARY JUDGMENT MOTIONS

 "The Administrative Procedure Act ("APA") governs judicial review of administrative decisions involving the Endangered Species Act." *Aluminum Co. of America v. Administrator, Bonneville Power Administration*, 175 F.3d 1156, 1160 (9th Cir.1999). Under the APA, a court has the authority to "hold unlawful and set aside agency action ... found to

be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* at § 706(2)(D). Review under this standard is narrow and a court "cannot substitute [its] judgment for that of the agency, particularly when 'the challenged decision implicates substantial agency expertise.'" *Aluminum,* 175 F.3d at 1160–61 (citing *Mount Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993)).

■ Plaintiffs allege Defendants did not use the best scientific evidence available. Defendants contend that Plaintiffs' arguments on this issue are misplaced because Plaintiff relies on Section 7 "best available data" cases, not Section 4 "best available data cases." *See* Def. Opp. at 14:4–11. The phrase "best available data" is found in Section 4 at 16 U.S.C. § 1533(b)(1)(A) and in Section 7 at 16 U.S.C. § 1536(a)(2). The distinction between Sections 4 and 7 of the ESA are discussed in *Sierra Club v. Babbitt,* 65 F.3d 1502, 1504 (9th Cir.1995):

> In an effort to prevent the extinction of various fish, wildlife, and plant species, Congress in section 4 of the ESA, 16 U.S.C. § 1533(a), directed the Secretary to list endangered and threatened species and to designate habitat critical to the survival of those species. Once a species has been afforded protection under section 4, federal agencies must comply with the procedural and substantive requirements contained in section 7 of the ESA, 16 U.S.C. § 1536. The purpose of section 7 is to avoid agency activities that will unfavorably affect a listed species.

*Id.* (footnotes omitted). This is a Section 4 case. There is no reason, however, why Section 7 authority interpreting "best scientific data available" should not be applied to Section 4 cases. The case law Defendants refer to as "directly on point," *Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670 (D.D.C.1997), applies Section 7 authority to its Section 4 analysis, *see id.* at 680. *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), holds:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives.

*Id.* at 176–77, 117 S.Ct. 1154. The Ninth Circuit has interpreted this provision to mean an agency cannot ignore available biological information. *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988) ("In light of the ESA requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the USFWS cannot ignore available biological information.").

■ Plaintiffs allege USFWS ignored two important submissions concerning the splittail: the July 17, 1998 comments of California Department of Fish and Game ("CDFG"), and the January 13, 1999 "Splittail Abundance and Distribution Update 1998." *See* Pl. Br. at 20:16–21.[2] Defendants counter "USFWS considered all

---

2. Plaintiffs also cite to CDFG's January 1999 report, which came out too late for consideration by Interior.

relevant scientific data made available to it up to and through the third commenting period." Def. Br. at 18:7–9.

As evidence that it considered all relevant scientific data, it notes: "A list of the references cited by the USFWS in the final regulation is found at AR 186." Def. Br. at 18 n.15. Neither of the two documents Plaintiffs allege Defendants ignored are on the list. Each is considered.

### 1. *The January 13, 1999 Splittail Abundance and Distribution Update* [3]

The Splittail Abundance Distribution Update was submitted to USFWS by the California Department of Water Resources on January 14, 1999. *See* AR at 38. The data showed that conditions in 1998 resulted in record or near record age–0 splittail abundance. *Id.* at 39. "[G]eographic distribution of splittail is much broader than previously believed and continues to expand as more information is gathered." *Id.*

In defense of not considering this data, Defendants argue that it was submitted at the close of the third comment period and less than two weeks prior to the judicially-imposed deadline for USFWS to publish its listing decision. *See* Def. Br. at 19:3–4. Even if, arguendo, the judicially imposed deadline was imminent, *see Independence Mining Co. v. Babbitt,* 105 F.3d 502, 507 (9th Cir.1997) ("The APA provides that a court may compel 'agency action unlawfully withheld or unreasonably delayed.'"), the docket for *Southwest Center for Biological Diversity v. Babbitt* establishes that the USFWS never sought an extension of the deadline to allow more time to consider the 1998 data, or to address the serious objections of the State of California Department of Fish and Game and the Resources Secretary, *see* Pl. Opp. at 5 n.2:

> Having voluntarily agreed to the deadline, and having never sought an extension, defendants cannot legitimately claim that the court deadline precluded the Service from considering the 1998 data.

*Id.* In light of such significant conflicting data, not from a partisan, but another public agency vested with identical environmental protection duties to further the public interest,[4] Defendants did nothing. As paragraphs four and five of the Hanson Declaration show, using only AR data, calculating average abundance for the species over 1985 through 1998, four out of five indices showed an increase in average abundance in the later period. These conditions and comparisons, *see* Hanson Decl. ¶¶ 6–7, result in the opinion that "current adult splittail population is resilient and can respond to favorable hydrological conditions at a rate comparable to, or above that occurring within the estuary before 1984." Defendants' efforts to ignore the CDFG's data and opinion are arbitrary and capricious under the totality of the circumstances. The evidence in the administrative record demonstrates that Defendants had warning at least by July 1998 that the splittail population was increasing, that the listing decision was challenged, not just by water users, and that the data they relied on was presented by one primary biologist, whose apparent selective

---

**3.** It is assumed that the Splittail Abundance and Distribution Update discussed by Plaintiffs is the 1998 Index of the Splittail discussed by Defendants is the same document.

**4.** The 1998 Fall Midwater Trawl Survey (all ages) and the 1998 Fall Midwater Trawl Survey (age–0 index) show the highest splittail abundance ever recorded for those surveys. The 1998 Summer Townet Survey, the 1998 Bay Otter Trawl, and the 1998 Bay Midwater Trawl showed the second highest level of abundance ever recorded.

data presentation and lack of objective analysis of all conditions concerning the species, are directly inferential of bias. The Secretary may not ignore available biological information. *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir.1988).

The rationale set forth in Defendants briefs also contradicts the press statement issued with the Final Rule in February 1999. In response to its own question: "Why can't the 1998 index of the splittail be considered in the Service's final determination?" AR at 23, Interior responded:

The abundance indexes for 1998 resulted from *exceptional hydrologic conditions*. There is a weak stock recruitment relationship for this species, which means overall population cannot be predicted from juvenile abundance. The assurances that suitable habitat would be available in other than exceptionally wet years to maintain the population has not yet been achieved. Also, the 1998 abundance data does not specifically address the threats that exist for the species.

AR at 23 (emphasis added). From this statement, it can be inferred that 1998 was a "wet" year. In its final rule, USFWS stated that it only considered "wet" years. *See* AR at 5. Yet, it ignored 1998, obviously because the data are not to its liking. The inconsistency of Defendants' conclusion is best demonstrated by the Service's inclusion in the data baseline of 1983, the wettest year on record, but not 1998, a drier year said to be a period of "exceptional hydrological conditions." Such an approach is irreconcilable and is strong evidence of arbitrary and capricious action.

2. *Duty to Show Relationship Between the Data Relied Upon and Conclusion That the Splittail is a Threatened Species.*

 Defendants have a duty under 16 U.S.C. § 1533(b)(8) to summarize the data on which the regulation is based and to show the relationship of such data to the final regulation. In this case, this means the final rule must show the relationship between the data Defendants relied upon and the conclusion that the splittail is a threatened species. *See Bennett v. Spear*, 520 U.S. 154, 172–73, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). This non-discretionary duty is subject to judicial review. *See* (16 U.S.C. § 1540(g)(1)(C)).

The ESA applies to those species "so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20); 50 C.F.R. § 424.02(m). Defendants' data findings are that splittail population abundance has declined since the early 1980s; the splittail's range is smaller than it used to be; and threats exist to the splittail such as future water projects, water quality problems, and predatatory species. Defendants conclude: "[A]lthough this species is not in imminent danger of extinction, it is likely to become endangered in the foreseeable future if present threats and current population trends continue." A.R.1:000015. The final rule listing the species does not estimate current splittail population size; does not state whether, or why, current population size is inadequate to prevent extinction in the near future; does not describe a rate of population decline; does not identify a minimum viable population size; does not explain how the splittail's current range jeopardizes the species to the point of extinction in the foreseeable future; nor does it measure the impacts that other allegedly threatening factors to the splittail have on the species population as a whole.

Plaintiffs' expert demonstrates that the relevant science measures issues such as current population size; projected future

rate of decline; minimum viable population size; minimum habitat area necessary to avoid danger of extinction; and a time period on which the Splittail faces extinction risk. *See* Hanson Declaration ¶ 10. Defendants have abdicated their duty to show the relationship between the data relied upon and its conclusion to list the splittail.

3. *The July 17, 1998 CDFG Comments*

The July 1998 CDFG comments are titled "Review of the Status and Distribution of Splittail with Regard to the Request of the U.S. Fish and Wildlife Service for Comments on their Proposal to List Splittail as Threatened under the Federal Endangered Species Act." AR at 2157:

> The California Department of Fish and Game recommends that the splittail *not be listed as Threatened* at this time. *Surveys do not show a long-term decline in abundance.*

*Id.* (emphasis added). CDFG further advised Interior that "initial catches of age–0 fish ... *suggest 1998 will be another exceptional production year for splittail.*" AR 4:002157–58 (emphasis added). This information is significant because it totally conflicts with USFWS' expert opinion, *i.e.,* that splittail abundance was not decreasing.

Interior counters that it responded to CDFG's July 1998 comments. *See* Def. Opp. at 25:15–16. Defendants' countercitation is from the final rule. *See* AR at 5. One of the issues expressly addressed by Interior was the following:

> One respondent commented that the data we used to determine the decline of splittail was biased by the fact that the time period used to determine pre-decline and post-decline was heavily weighted with wet years in the pre-decline period, thereby biasing the analysis.

AR at 5. This is only one of the issues raised by CDFG. Interior, apparently intentionally, ignored the rest. It did not address CDFG's opinion that 1998 was an abundant splittail year and the implication that splittail were not in decline in prior years and, to the contrary, were found in increasing abundance.

In response to this comment it isolated from CDFG's submission, Interior stated:

> We analyzed only wet years to determine if there had been a decline within that year type. That analysis indicated that even in wet years, when one would anticipate substantially higher recruitment, there had been an overall decline in splittail abundance.

*Id.* This conclusion is sustainable only by a manipulation of the data. Further, as an explanation for why the 1998 data was not used, Interior stated it was because 1998 was a "wet" year, which it then proceeded to ignore.

Another relevant aspect of the July 1998 CDFG review is its valid observation that, "[d]eclining trends in some surveys of medium-term duration are attributable to those surveys starting at or near an abundance peak in the early 1980s and sampling through the low abundance period of the 1987–1992 drought." AR at 2157. Although the "surveys" are not expressly identified by CDFG, an examination of the Administrative Record illustrates where they can be found. The Meng/Moyle 1995 study concludes: "Splittail abundance declined an average of 62% over the 13 years from 1980 through 1992." AR at 1397. Notwithstanding this critique of Meng and Moyle, USFWS considered only it and eight other studies authored by Meng and/or Moyle. *See* AR at 189–91. There is no indication that USFWS considered any of the conflicting data. To the extent that the press release can be read to state that no 1998 submissions were considered

in promulgating the final rule, this is belied by Defendants' consideration of a 1998 working document submitted by P.B. Moyle entitled "The revised Inland Fishes of California." AR at 190.

Responding to the suggestion that the Meng/Moyle data is biased, the Federal Defendants responded that the study "was peer-reviewed and published in the American Fisheries Journal," RT at 97:3–5, suggesting that had the data been biased, the study would not have been published. This does not necessarily follow.

At argument, Federal Defendants focused on the importance of "complete" data sets. *See* RT 73:14–19. Since the July 1998 submission only discussed six months worth of data, it was deemed incomplete. They also argue that the January 13, 1999 submission was not a complete data set. *See* RT 104:17–22. In addition, they differentiated between the USFWS analysis, which was "quantitative," apparently because it used complete data sets, and the CDFG, which was "qualitative." RT at 70:21–71:4. They summarize CDFG's findings as a population "spike" during a wet year and dismiss it. *See* RT at 71:7–72:1. Ultimately, Federal Defendants have offered a post hoc rationalization for ignoring significant data, and a diametrically opposed opinion from a state fish and game agency vested with the same responsibility to protect fish, which recommends the species not be listed as threatened. In light of such a material conflict, Federal Defendants' treatment of the issues is inadequate, arbitrary, capricious, and not based on the best scientific and commercial data available.

Section 4(i) of the ESA requires the Secretary, if "a State agency ... files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments ... [to] submit to the State agency a written justification for [the] failure to adopt regulations consistent with the agency's comments ..." 16 U.S.C. § 1533(i). Not only did Defendants not submit the required written justification, they ignored and failed to acknowledge that not only CDFG and CDWR, but also the California Resources Secretary, Douglas Wheeler, submitted specific substantive objections to the listing of the splittail.

## VI. CONCLUSION

█ An agency has wide latitude to determine what is "the best scientific and commercial data available." This phrase "does not explicitly limit the Secretary's analysis to apolitical considerations ... the Secretary must be permitted to choose the one that best suits all of its interests, including political or business interests." *Southwest Center for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 523 n. 5 (9th Cir.1998). Here, however, there is no indication Defendants considered substantial evidence that suggests the splittail should not be listed, despite the significant contrary data and opinion of the CDFG, an agency committed to fish protection, the personnel of which, Defendants admit are neither less competent or less honest than USFWS. Nor is there evidence that USFWS attempted to acquire a broader range of unbiased data or address critiques of the studies they used, which appear biased. They violated other provisions of the ESA requiring relation of the data to the listing decision and written justification to the State agencies that opposed the listing. The entire record shows the listing decision was not the result of fair, impartial, or reasoned decision making. Since the decision to list the splittail, USFWS has provided conflicting rationales as to why other conflicting evidence was not considered.

Under the totality of the circumstances, this is an arbitrary and capricious decision not reached in accordance with law. Plaintiffs motion for summary judgment is GRANTED.

Plaintiffs shall submit, within five (5) court days following date of service of this decision, proposed findings of fact and conclusions of law and a proposed judgment. The parties may submit authorities, not to exceed five (5) pages, as to the appropriate form of summary judgment order to be entered, including whether any bona fide justification exists for imposing any measure necessary to continued protection of the splittail.

SO ORDERED.